**METHODIST MISSION HOME OF TEXAS, Appellant,**

**v.**

**N_____ A_____ B_____, Appellee.**

**No. 14821.**

Court of Civil Appeals of Texas, San Antonio.

March 4, 1970.

Joe Frazier Brown, H. S. Piland, San Antonio, for appellant.

Jack F. Ridgeway, San Antonio, for appellee.

CADENA, Justice.

Defendant, Methodist Mission Home of Texas, a licensed adoption agency, appeals from a judgment declaring that certain instruments executed by plaintiff, surrendering parental custody and control of her infant illegitimate child to, and permitting placement of the child for adoption by, defendant are void. The judgment is based on a jury finding that the execution of the instruments by plaintiff was the result of undue influence exerted on her by defendant's agents and employees.

Defendant seeks a reversal of the judgment and a remand of the case on the ground that there is insufficient evidence to support the jury finding of undue influence.

The parties agree that, since plaintiff consented to the placement of her child for adoption by an agency licensed by the State of Texas, the consent is revocable only on proof of "fraud, mistake, misrepresenta-

tion, overreaching and the like." Catholic Charities of Diocese of Galveston Inc. v. Harper, 161 Tex. 21, 337 S.W.2d 111, 114–115 (1960). The case was tried below on the theory, not questioned here by either party, that a consent executed as the result of the exertion of undue influence on the consenting natural parent is subject to revocation under the Harper Rule.

The Methodist Mission Home in San Antonio is operated by the United Methodist Church as a maternity home to provide "proper care for the girl or woman who finds herself faced with an out-of-wedlock pregnancy." The United Methodist Church is the principal source of financial support for the Home. Additional sources of revenue include fees paid by girls who are admitted to the Home,[1] contributions made by other religious organizations, and donations made by individuals, including gifts made by persons who adopt the children surrendered to the Home.

In addition to board, lodging and medical care, girls admitted to the Home receive the benefit of counselling by trained social workers who are members of the Home's counselling staff. This counselling concerns the girls' personal problems and vocational plans as well as "plans for the unborn child." Once each week, the residents participate in group counselling sessions, conducted by Rev. Don Lilljedahl, Director of Counselling, assisted by Mrs. Sharon Burrows. In addition, each resident meets privately with her individual counsellor about once a week. Plaintiff's individual counsellor was Mrs. Jo Ann Burns. Plaintiff's claim of undue influence concerns the conduct and statements of Rev. Lilljedahl, Mrs. Burrows and, particularly, Mrs. Burns.

1. Whenever possible, the girl or her family is expected to pay a reasonable part of the cost of the services furnished by the Home. The suggested fees for room and board are $65.00 for the first week and $40.00 for each week thereafter. The suggested fee for medical care ranges from $300.00 to $600.00, depending upon the medical problems presented by each preg-

nancy and delivery. However, no applicant is denied admission because of inability to pay. Plaintiff, who was a resident of the Home for more than 15 weeks, made a payment of $150.00 when she was admitted. She has made no further payments, nor has the Home made any effort to collect any additional amount.

When the question before us concerns the "sufficiency" of the evidence to support a jury finding, we must consider and weigh all of the evidence in the case, not merely that which supports the verdict. We may set aside the verdict and remand the cause for a new trial if we conclude that, in view of all the evidence, the verdict is manifestly unjust, even though the record contains some evidence of probative force in support of the jury finding.[2]

An examination of the entire statement of facts reveals that there is sufficient evidence to support the following conclusions:

1. It is the policy of the Home to encourage unwed mothers to release their children to the Home for placement for adoption.[3]

2. The Home's counselling staff attempted to persuade the residents to release their children for adoption.[4]

3. During the time, prior to the birth of plaintiff's son, that the Home's staff believed plaintiff intended to give up her child no effort was made by the counsellors to induce plaintiff to reconsider her decision.[5]

4. After plaintiff, subsequent to the birth of her son, announced her decision to keep the child,[6] Mrs. Burns initiated a series of interviews with plaintiff, extending over a period of about five days, as the result

---

2. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1952). We agree with, but find little comfort in, the observation by the Supreme Court in King that it is "not simple to describe the intellectual process to be followed by the Court of Civil Appeals in passing on the fact question—to specify just how a verdict may be supported by evidence of probative force and at the same time be on all the evidence so clearly unjust as to require a new trial." 244 S.W.2d at 662. See, generally, Garwood, Insufficient Evidence Appeal, 30 Tex.L.Rev. 803 (1952).

3. The following statements are found in a printed brochure which is sent to each girl who expresses an interest in being admitted to the Home: (a) "Usually, the best plan is to allow the baby to go into a good adoptive home." (b) "Most of our Residents see adoption as the best possible plan for themselves and the baby, but if a Resident should decide to keep her baby, she must make proper plans for the baby before she is ready for delivery." (c) "When it is clearly indicated that the girl and her family plan to keep the baby, it must be recognized that such a plan means that the out-of-wedlock pregnancy cannot be concealed from other members of the family, friends and the community, and this would not be good for either the girl or her child."

In the Resident Handbook, which is given to each girl on her admission to the Home, we find: "At various times during the year, a careful explanation of adoption procedures will be made * * *. This includes why, in most cases, adoption of a baby born out-of-wedlock offers the child as well as his mother the greatest opportunity for normal development."

4. Plaintiff testified that the counsellors repeatedly stressed that an unwed mother should give up her baby. Rev. Lilljedahl, Mrs. Burrows and Mrs. Burns, the only persons from whom plaintiff received counselling assistance, denied that they ever suggested that plaintiff, or any other resident, should release her child for adoption. However, plaintiff's testimony is buttressed by the fact that it is the policy of the Home to encourage release for adoption and that, according to the Resident Handbook, at various times during the year the members of the Home's staff would explain to the girls the reasons why they should not keep their children. See n. 3, above.

5. In her application for admission, plaintiff stated that she intended to release her child for adoption. Mrs. Burns testified that, prior to the birth of her son, plaintiff was "very definite" in her decision to give up the baby. The counsellors all testified that, during this period, they did not, to the best of their recollection, discuss the matter to any significant extent with plaintiff, who was very reluctant to discuss her personal problems. Mrs. Burns declared that since plaintiff showed no signs of indecision, she did not consider it necessary to discuss with plaintiff "the pros and cons for releasing the baby, versus to keep the baby," during this period.

6. Plaintiff's son was born on Saturday, November 23, 1968. When plaintiff left the hospital and returned to the Home on Tuesday, November 26, she called her mother in California and made known her intention to keep the child. The testimony of plaintiff's mother corroborates this, as does the testimony of Mrs. Bur-

of which plaintiff consented to the placement of the baby for adoption.

5. Although Mrs. Burns testified that she initiated the interviews for the purpose of discussing with plaintiff the "pros and cons" of the problem, the counsellor's contributions to the discussions consisted solely of a recital of the reasons why plaintiff should give up her baby.[7]

6. Mrs. Burns implanted in plaintiff's mind the belief that plaintiff's parents, who had announced they would support plaintiff in her decision to keep the child, were attempting to take advantage of plaintiff. As a result, plaintiff successfully insisted that her step-father and sister, who had started the journey to Texas for the purpose of driving plaintiff and the child to California, "turn around and go back" to California.[8]

During the period between Tuesday, November 26, and Tuesday, December 3, when

rows. According to plaintiff, she made her decision known to Mrs. Burns. Mrs. Burns testified that plaintiff merely said she was "thinking of" keeping her child.

7. Plaintiff's testimony concerning these discussions may be summarized as follows: Mrs. Burns accused plaintiff of being selfish and stated that plaintiff had no right to keep the child. The counsellor declared that the fact that plaintiff loved her son was not a sufficient reason for the decision to keep him. She pointed out that plaintiff could have other children, while adoptive parents generally were a husband and wife who were unable to have children of their own. Consequently, according to Mrs. Burns, adoptive parents would love the child more than would plaintiff. The counsellor listed the dire consequences which would result if plaintiff, an unwed mother, kept the child. She stated that the child would always be a burden to plaintiff and would make it difficult for plaintiff to find a husband. She declared that even if plaintiff married later, her husband "would probably resent" the child. Mrs. Burns asked plaintiff what plaintiff would do when, some day in the future, her son returned home from school and asked, "Mommy, what's a bastard?"

Mrs. Burns denied that she ever suggested to plaintiff that the child should be released for adoption. She admitted that she told plaintiff of a situation where an unwed mother, who had decided to keep her child, suffered the experience of having her child ask the meaning of "bastard," and was unable to cope with the situation. According to Mrs. Burns, she related this incident to plaintiff merely as an example of what had happened to another unwed mother, and pointed out that plaintiff might not have to face such a situation even if she decided to keep her child.

Plaintiff testified that, during these discussions, she asked Mrs. Burns if any unwed mother had found happiness although she kept her child, and that Mrs. Burns replied, "I don't know, I never inquired about that at all." In her testimony, Mrs. Burns admitted that, during her discussion of the "pros and cons for releasing the baby, versus to keep the baby," she did not mention one instance where an unwed mother's decision to keep her baby had resulted in happiness for either the mother or the child.

8. According to the testimony of plaintiff and her mother, on Thanksgiving Day, November 28, 1968, plaintiff's mother, in California, telephoned plaintiff to announce that plaintiff's step-father and sister had departed for Texas early that morning and would drive plaintiff and the child to the family home in California. Plaintiff testified that when Mrs. Burns learned that plaintiff's family was on the way to San Antonio, and that they had decided to come for plaintiff without consulting plaintiff, the counsellor commented that it appeared that plaintiff's parents had "put something over on" plaintiff, and that they were attempting to exert "pressure" on plaintiff so that she would not have an opportunity to change her mind. Plaintiff's testimony is to the effect that she then felt that she had to intercept her step-father and sister and tell them to return to California. After this conversation with Mrs. Burns, according to plaintiff, she was unable to eat or sleep, and at 1:30 A.M. the following day she called her mother and insisted that her step-father and sister return to California. Plaintiff's mother testified that, on this occasion, plaintiff was hysterical and kept screaming that her family had "tricked" her. The mother of one of the residents testified that plaintiff, in a highly emotional state, had declared that her family was subjecting her to "undue stress," and were attempting to deprive her of a chance to change her mind. According to this witness, plaintiff was filled with antagonism toward her family.

plaintiff signed the instruments consenting to the adoption, plaintiff was very weak and Mrs. Burns, according to plaintiff, repeatedly and "emphatically stressed" that if plaintiff "was any sort of person" she would give up the child. Plaintiff described this period as a "nightmare" during which she was able to sleep only about three hours a day.[9] She testified that, as a result of her discussions with Mrs. Burns, she felt "trapped," and that on Monday, December 2, after Mrs. Burns had repeated everything that the counsellor had said before, she consented to the adoption of her child in order to avoid "harassment."[10]

What constitutes "undue influence" depends on the particular facts and circumstances of each case, viewed in the light of applicable principles of law. It is said that a finding of undue influence is justified only where the actor's free agency and will have been destroyed and subverted to the extent that his act, instead of expressing his own will, expresses the will of the person exerting the influence. Rothermel v. Duncan, 369 S.W.2d 917 (Tex.Sup.1963); Winn v. Daniel, 386 S.W.2d 293 (Tex.Civ. App.—Fort Worth 1965, writ ref'd n. r. e.). Such statements of principles of law, since they involve inquiry into the metaphysical concept of will, furnish no concrete guidelines which are helpful in the decisional process. Since each case is more or less *sui generis,* any attempt to formulate a precise definition will be futile.

It is true that exerted influence cannot be branded as "undue" merely because it is persuasive and effective, and that the law does not condemn all persuasion, entreaty, cajolery, importunity, intercession, argument and solicitation. Robinson v. Stuart, 73 Tex. 267, 11 S.W. 275 (1889); Winn v. Daniel, supra. It may be conceded that calling to the attention of an unwed mother the considerations which tend to show that her best interest, and that of her child, would best be served by placement of the child for adoption cannot be branded as undue influence, even though she is thereby induced to give up her child.[11] See In re Surrender of Minor Children, 344 Mass. 230, 181 N.E.2d 836, 838 (1962).

But in this case we have testimony which amply supports the conclusion that plaintiff was subjected to excessive persuasion. All of the witnesses agreed that plaintiff was shy and reluctant to discuss her personal problems. Plaintiff's testimony concerning her emotional distress during the critical period following the birth of her child is rendered credible by

9. Plaintiff testified that she lost thirty pounds during the period between the birth of her child on November 23 and December 3. Although Mrs. Burns testified that during this time plaintiff appeared more talkative and more relaxed than at any previous time, plaintiff's testimony is corroborated by the testimony of plaintiff's mother and the testimony of the mother of plaintiff's closest friend among the residents, although the latter testified that plaintiff was upset because of the conduct of her parents.

10. Mrs. Burns completely contradicted plaintiff's version of the December 2 interview. The counsellor described the incident as follows: On December 2 plaintiff, appearing cheerful and relaxed, came to the office of Mrs. Burns, and without waiting to be asked, announced that she had decided to give up her child. When Mrs. Burns inquired concerning the reasons for such a decision, plaintiff answered that she had been considering keeping the baby as a means of establishing a closer and more affectionate relationship with her parents, but that, after thinking it over, she realized that, if she kept the child, her parents' love and affection would be directed toward the baby, rather than toward plaintiff.

11. Because of prevailing social attitudes which brand both the unwed mother and her child as social outcasts, respectable sociological authority embraces the view that placement for adoption of a child born out of wedlock offers such child perhaps the only chance to escape the status and stigma of illegitimacy and to escape from an environment in which he would have little opportunity to lead a normal and happy life. Comment (1961) 28 U. of Chi.L.Rev. 564, 568.

the fact that an unwed mother who has just given birth is usually emotionally distraught and peculiarly vulnerable to efforts, well-meaning or unscrupulous, to persuade her to give up her child. Immediately following plaintiff's announcement that, contrary to the expectations of Mrs. Burns, she intended to keep her son, she was subjected to an intensive campaign, extending over a five-day period, designed to convince her to give up her baby, rather than to insure that her decision, whatever it might be, would be based on a consideration of all relevant factors. Plaintiff was told, falsely, that she had no right to keep her child. She was accused of being selfish and told that if she "was any kind of person" she would consent to the adoption of her baby. Her parents, the only persons who were willing to accept plaintiff's decision to keep her child, were accused by Mrs. Burns, with no factual support, of acting out of improper motives and with the intention of "putting something over" on plaintiff. What Mrs. Burns described as a discussion of the "pros and cons" consisted entirely of an endless recital only of the "cons"—a repetitive monologue of the reasons why plaintiff should not keep her child. The polemic by Mrs. Burns was in keeping with the policy of the Home to encourage the residents to surrender their children to the Home's placement agency. Further, this concentrated assault on plaintiff's will came from a person to whom plaintiff was encouraged to look for guidance, a member of an organization to which plaintiff was undoubtedly indebted and on which, according to all the testimony, she was dependent for help in finding her employment and a place to live.

Viewing the totality of the situation, we cannot say that, under the evidence, the jury acted unreasonably in concluding that the influence exerted on plaintiff was such as to constrain her to execute a consent which she would not otherwise have executed. Nor can we say that, considering all of the evidence, the finding is such as to "shock the conscience," or that it is "clearly unjust," or that it "clearly indicates bias" so that a court would "have to go blind" in order to accept it. Garwood, The Question of Insufficient Evidence on Appeal, 30 Tex.L.Rev. 803, 811 (1952).

The judgment of the trial court is affirmed.