*In re* Petition of BARRY J. HUEBERT *et al.*, to adopt SARA ELIZABETH MARSHALL, a minor, Plaintiffs-Petitioners, Appellees, *v.* TIMOTHY IAN MARSHALL *et al.*, Defendants-Cross-Petitioners, Appellants—(ROLF M. ERICKSON *et al.*, Appellants.)

(No. 54928; ▮▮▮▮▮▮▮

First District—April 28, 1971.

*Rehearing denied June 2, 1971.*

Sidley & Austin, Alice M. Bright, and Sylvia O. Decker, all of Chicago, (Douglas F. Fuson, of counsel,) for appellants.

Leo E. Holt and Maria A. Elden, both of Chicago, for appellees.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

A decree of adoption was entered in the Circuit Court of Cook County allowing the adoption of Sara Elizabeth Marshall by Barry and Anita Huebert. The natural parents of Sara Elizabeth Marshall, Timothy Ian Marshall and Paula Jean Marshall, and the maternal grandparents, Rolf M. Erickson and Sylvia C. Erickson, appeal the decree and other orders entered in the cause.

The Marshalls filed a motion for leave to file their cross-petition. In Count I of the cross-petition they sought to adopt Sara Elizabeth Marshall. In Count II they asked that the consents to adoption they signed be set aside because of fraud and duress. The court granted petitioners' motion to strike Count I, and subsequently denied cross-petitioners' motion to vacate the order dismissing Count I. After a trial on the issues on Count II, the court entered an order denying the prayer of Count II.

The natural grandparents filed a motion asking leave to file their ap-

pearances and consents to the adoption of Sara Elizabeth Marshall by cross-petitioners. This motion was denied.

On appeal cross-petitioners contend the order denying Count II of the cross-petition was against the manifest weight of the evidence and that the court erred in admitting the records made by Helen Schimmeyer, an employee of the Cook County Department of Public Aid.

In the alternative, cross-petitioners contend the court erred in denying the natual grandparents leave to file their appearances and consents and in striking and dismissing Count I of the cross-petition. Further, cross-petitioners contend that petitioners wholly failed to prove their financial ability and the court erred in overruling cross-petitioners' objections and entering a decree of adoption.

This court only finds it necessary to discuss that part of the record pertaining to whether the consents were obtained by fraud and duress.

Sara Elizabeth Marshall was born on April 17, 1969. The natural parents, Paula and Tim Marshall, were very happy about the birth. Tim is 26 and has a high school education, and Paula is 24 and has had one year of college. They have one other child, Erica, who is five years old.

After leaving the hospital, Paula stayed with Tim's parents for four days. She appeared to be disorganized but happy. About a week after giving birth she called her doctor about her weight. On his advice she began taking Eskatrol (diet pills) and Diuril (a diuretic). She continued the medication about ten to fourteen days and lost about fifteen pounds.

On Friday, April 25, Tim told Paula he had lost his job and that he was going to leave her. He said he "didn't feel capable of handling the job or the situation of being married, and wanted to get out of Chicago and get out of the situation I was in." Paula was disbelieving and became hysterical.

On Monday, April 28, Julie Brown went to see Paula and found she was still in the same condition. Julie tried to calm her down and told her she should never have had the baby. She said she knew of a couple who had wanted to adopt a baby but were unable because it was stillborn. Julie told Paula the Hueberts were good people, that they would provide a good home for the baby and would be good parents.

Julie had been a good friend for about three years and saw Paula about two or three times a week. Tim and Paula and Julie and her husband had gone out together from time to time, but Julie was divorced from her husband on January 30, 1969, after being separated about a year. However, Paula did not know that Julie and her own husband, Tim, had become emotionally involved and had discussed the possibility of meeting in California.

On Monday, April 28, Paula talked with Judy Ripp and said she was

worried that she would not be able to support herself and two children. She was very distraught during this period, and Judy was unable to reason with her.

On April 29, Paula called Julie and asked if the people still wanted a baby. Julie said she thought so but did not want to call unless Paula was really sure. Later that morning Paula called Julie and said she would like her to call the Hueberts. At this time Julie cautioned Paula not to talk to anyone because "they'll just talk you out of it." Mrs. Huebert did not at any time ask Julie Brown what her interest was in arranging the adoption, nor did she try to ascertain what it might have been.

Mr. James R. Donnelly, the Hueberts' attorney, called Paula at about 1:30 that same day and told her he was representing some people who wanted to adopt a baby and that he had made an appointment for her to go downtown to the Cook County Department of Public Aid. Paula said she could not make any decisions and would have to talk to her husband. Mr. Donnelly did not ask whether she was represented by counsel or whether she had had any independent advice.

When Tim Marshall came home, Paula told him what had happened, and he called Mr. Donnelly. Tim told him he could not make a decision at that time and would call him back. Paula then told Tim she could not "take it with the baby. I'm too upset. You have lost your job and you are leaving me. I don't know what to do. It's the best thing for the baby. These people want a baby and they are able to take care of the baby and I'm not." Tim called Mr. Donnelly back and was told they had to be "interviewed" at the Department of Public Aid. When questioned about whether there was a waiting period in this situation, Mr. Donnelly said it would be six months before it would be final. Mr. Donnelly and Julie Brown were the only ones Tim and Paula talked to about the possible adoption.

On April 30, Tim and Paula went to the Department of Public Aid. They were interviewed separately by Helene Schimmeyer. Each interview took about fifteen or twenty minutes. Paula testified she was not alert during the session: "I was strange. I wasn't me." She also said she cried about 50% of the time. Paula and Tim then went in together, and Mrs. Schimmeyer said, "You have lost your job and you are thinking of leaving." Tim said, "Yes, I think so." She said, "All right," and led them down the hall to see Mrs. Wideikis who handled the signing of the consent papers. Mrs. Wideikis explained the finality of their actions, but Tim did the talking for both, since Paula seemed distant and was not reacting. This interview lasted five to ten minutes. Each signed two "copies" of the consents. Two of the forms were complete except for

the names of the adopting parents which were inserted by Mrs. Schimmeyer after the forms were signed. Two of the forms lacked the names of the adopting parents and information as to the sex and place of birth of the child. No alternative suggestions for dealing with the situation were offered at any of the interviews.

Afterwards Tim called Mr. Donnelly to tell him they had signed the papers. Tim said, "Does the other couple get the baby now?" Donnelly said, "Well now there is a trial period before it's theirs."

Paula called her mother when they got home to tell her what they had done. After the conversation Paula told Tim she would not let the baby out of the door, and that her mother would take care of the baby.

Julie Brown came to the apartment at 8:00 or 9:00 P.M. to pick up the baby. Tim handed it over while Paula just sat there with a blank stare. Julie again repeated not to talk to anybody.

On May 1, Paula went to Judy Ripp's apartment and told her about the interview. Judy asked, "Didn't these people offer you a foster home or a marriage counselor or something," and Paula said, "No." Judy asked, "If they had offered it to you would you have done it?" Paula said, "In a minute."

The cross-petitioners argue that their consents were obtained by fraud and duress and should be set aside. Section 9.1—11 of the Adoption Act provides, in part, as follows:

"A consent to adoption by a parent * * * executed and acknowledged in accordance with the provisions of Section 8 of this Act * * * shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find." (Ill. Rev. Stat., 1969, ch. 4, par. 9.1—11.)

In *People ex rel. Buell v. Bell* (1959), 20 Ill.App.2d 82, 95, the court quotes from *People v. Gilmore* (1931), 345 Ill. 28, on the general principles of fraud:

" 'Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture, * * * If fraud be proved it vitiates all transactions touched by it * * *.

Moral duress consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another, and relief is granted in such cases on the basis that the party benefiting thereby has received money, property, or other advantage which in equity and good con-

science he should not be permitted to retain: 12 Ill. Law and Pract., p. 281.'"

In *Buell*, the court's decision was based on the time, place and other circumstances relating to the execution of the appearance and consent. The totality of the circumstances surrounding the adoption must be considered in determining whether there was fraud and duress.

In this case there are numerous examples of both. Paula was hysterical and distraught upon learning that her husband was thinking of leaving her. She was still in that same trance-like state three days later when Julie Brown first planted the idea of adoption. At the same time she was taking pills in order to lose weight. Whether the pills were a factor is purely a matter of speculation, but post-natal medication has been considered in other cases. *People ex rel. Buell v. Bell, supra; People ex rel. Karr v. Weihe* (1961), 30 Ill.App.2d 361.

The speed with which the adoption was effected is itself significant. Julie first suggested adoption on the morning of the 28th, and the papers were signed on the afternoon of the 30th. This is too little time in which to make a decision of this nature even absent other considerations. The petitioners suggest the relevant time to be considered is the time between birth and the signing of the documents. However, this period is inapplicable here because the birth of the child was welcomed by the parents and adoption was not even considered until about eleven days after the birth. Also, in all of the cases cited by the petitioners in which the consent was upheld, the mother had weeks or months to decide with numerous opportunities for independent advice. In *Karr*, the court took notice that the consent was signed less than ninety-six hours after the birth of the child. In the present case the consent was signed within sixty hours of the time when adoption was first considered.

Julie Brown's role in effecting the adoption and reasons for it cannot be overestimated. She was acting in a fiduciary capacity because of Paula's total trust in her at a time when Paula was not able to think for herself. Julie testified that her control over Paula was almost absolute: "In the state she was in Paula would have grasped onto anything, and my being a friend and respecting my friendship she took my word for everything almost like God." Julie violated that trust because she was secretly involved with Paula's husband and had talked of meeting him in California. Her deceit is obvious. She represented to Paula that the Hueberts were good people, had a fine home, and would make good parents. In fact, she had only chatted with Mrs. Huebert at the day care center, had only met Mr. Huebert once, and had never been in their home. Julie also informed Mrs. Huebert that Paula was calm when she

made the decision to put the child up for adoption and had never wanted the baby. This testimony is corroborated by Mrs. Huebert's inquiry as to why she had never gotten an abortion if she didn't want the baby. Mr. Huebert was a student, and the only income they had was a grant of $3600 a year, not enough to establish financial ability for adoption.

Furthermore, Julie repeatedly advised Paula not to talk to anyone. Her control over Paula at this time was such that Paula did not talk to anyone until after she signed the consent. Then she called her mother and immediately changed her mind, saying she would not let the baby out of the house.

Mr. Donnelly contributed to the situation by not asking whether the Marshalls were represented by legal counsel or had received independent advice of any kind. The American Bar Association Code of Professional Responsibility provides in Disciplinary Rule 7—104:

"(A) During the course of his representation of a client a lawyer shall not:

*   *   *

(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client."

Mr. Donnelly interjected confusion into the situation by mentioning the six-month period which the adoptive parents must wait to file for adoption. He did not explain that the six-month period applied to the adoptive parents only and had nothing to do with the consents of the natural parents. He mentioned this six-month period both before the interview and before Julie came to pick up the baby. Had the Marshalls been represented by counsel, confusion never would have happened. But Mrs. Marshall was misled. On May 1, Judy Ripp asked whether the adoption was finalized, and Judy recalled Paula saying, " 'Well, we did sign papers,' but she really didn't know, that there was a six month waiting period and she didn't know who it pertained to, whether it was to the adoptive parents or to her or to what." In *People ex rel. Karr, supra,* the mother signed the consent form believing she had six months to reacquire custody, and the court set it aside. Here, Paula was uncertain about whether such a period of time was in her favor. However, the mere fact that she did not know for sure or attempt to find out the truth shows her confused state of mind. We note that on the trial of this cause, Mr. Donnelly not only represented the petitioners but also testified on their behalf, relating his conversations with the Marshalls. This conflict of interests and conduct by an attorney cannot be condoned.

Another factor was the interviewing procedure at the Department of

Public Aid. The interviews were conducted hastily with no time to re-consider, or to consider any alternatives which might be advanced by the case worker, but were not. Even more culpable in this case was the absolute lack of any suggested alternatives. When Judy Ripp asked Paula about the possibility of a foster home or a marriage counselor, Paula replied, "I guess that wasn't the answer, these people are pro-fessionals or something; they might not have thought that was the an-swer." Paula also said if an alternative had been offered she would have accepted it "in a minute." In addition there were many other important questions not answered on the Public Aid forms which would suggest something less than a meaningful attempt to arrive at the best solution to the problem.

In one of the cases relied on by petitioners, *People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill.2d 84, the court upheld the con-sent, but the procedure was much different than in this case. In that case the baby was born on June 17 and the consent was not signed until June 30. During her pregnancy doctors and case workers repeatedly advised her about the consequences of signing the consent forms. Be-fore she signed, she was shown the section of the statute relating to irrevocability. Finally, when she signed the consent, she also signed a statement reciting that she had read the statute on irrevocability and that there was no duress or fraud. That case is inapplicable on the facts and is not in point here.

The circumstances in the instant case cannot be classified as being merely annoying or vexatious, nor was Paula's decision to consent the product of mere adverse argument or persuasion. We find the circum-stances prevented her from exercising her own free will, that she was overpowered and deceived by a woman she thought was her friend, but who was practicing a fraud upon her for selfish reasons. The attorney aided and abetted by his actions.

For the reasons stated herein, all amply supported by the evidence, we find it unnecessary to consider the other points raised on appeal. The consent of Paula Marshall was obtained by duress and fraud and is therefore null and void and is hereby vacated and set aside. The decree is against the manifest weight of the evidence and is reversed.

Decree reversed.

ADESKO, P. J., and BURMAN, J., concur.