Charles SCOTT and Delores Scott, Petitioners-Appellees,

v.

Aurelia Elizabeth PULLEY, Intervening Petitioner-Appellant,

v.

CHRISTIAN COUNSELING SERVICES, Respondent-Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Nov. 14, 1985.

Application for Permission to Appeal Denied by Supreme Court, Jan. 21, 1986.

 

Renard A. Hirsch, Sr., Nashville, for petitioners-appellees.

Kim L. Kirk, Woods, Woods & Watson, Nashville, for intervening petitioner-appellant.

Lucien Dale, Nashville, for respondent-appellee.

## OPINION

LEWIS, Judge.

This is an appeal by Aurelia Elizabeth Pulley from the Trial Court's dismissal of her "Motion for Permission to Intervene in Adoption Proceedings" and "Petition to Revoke Surrender of Child."

Miss Pulley is the natural mother of a child born out of wedlock on December 13, 1983. She surrendered the child to Christian Counseling Services (CCS) before the Honorable Muriel Robinson on January 13, 1984.

Miss Pulley, at the time she executed the surrender to CCS, was one month from her nineteenth birthday. She was a second year student at Tennessee Tech University, studying towards a major in mass communications.

Approximately one week before the child was born, Miss Pulley told her obstetrician that she wanted to give the baby up for adoption. Her obstetrician referred her to an agency, "Choice of Life." She informed "Choice of Life" that she wanted to place the baby for adoption and that, while she had no preference as to religion, she preferred that the adopting parents be

"black." After consultation with three ladies at "Choice of Life" for a period of some three hours, she was referred to CCS.

Miss Pulley went to CCS on December 8, 1983, conferred with Rebecca Morsh who gave her a "Natural Parent Preliminary Questionaire." Miss Pulley took the questionaire home where she completed it and returned it to CCS. The questionaire contained, *inter alia,* the following: "Q. At this point, what are your plans for the baby? You may not have made a definite decision yet, but in what direction are you leaning?" She answered: "Adoption."

The child was born at 2:00 A.M. on December 13th without any anesthesia or narcotic being administered to Miss Pulley. At 1:00 P.M. on December 13th, Rebecca Morsh came to Miss Pulley's hospital room and, in the presence of Miss Pulley's mother, asked Miss Pulley "to sign releasing the baby to the custody of Christian Counseling Services." Miss Pulley executed the document with her mother witnessing the release form. Miss Pulley also signed a second document at that time which allowed the CCS to make plans for the child.

Miss Pulley understood the document and stated that she was not under the influence of any drug and that it was at that time her intention to sign the document releasing the child.

The surrender was scheduled before Judge Robinson for January 8, 1984. Miss Pulley missed this date, and the surrender was rescheduled for January 13, 1984.

Ms. Morsh came to Miss Pulley's home on January 13th and took her to the Davidson County Courthouse for the surrender. Miss Pulley admits that neither Ms. Morsh nor anyone else did or said anything to "intimidate" or "coerce" her into signing the surrender document. No one insisted that Miss Pulley go through with the surrender. At no time prior to the surrender did Miss Pulley tell Ms. Morsh or anyone else that she had changed her mind about placing the child for adoption.

At the surrender, while Miss Pulley and Judge Robinson were alone in Chambers, she was informed by Judge Robinson that "if I changed my mind, I had thirty days" to revoke. She was asked by Judge Robinson if she was surrendering her child under duress, and she answered that she was not. In answer to Judge Robinson's question, Miss Pulley stated that she felt it was in the best interest of both herself and the child for the child to be surrendered for adoption.

On either February 12th or 13th, Miss Pulley had her mother call CCS to see if there was anything she could do about getting her child back. Miss Pulley testified that she really made up her mind that she wanted to keep the child after she had seen him some several days after the surrender was final.

Miss Pulley's mother talked with an attorney in Birmingham sometime in either February or March, 1984, regarding revocation of the surrender. This attorney advised Miss Pulley's mother that Miss Pulley should do something "in a hurry" about the surrender. Miss Pulley testified that she talked with three different attorneys about representing her before she hired her present counsel. One of these attorneys had a conflict, and two of them told her that they did not feel she could prevail.

In any event, the petition to intervene was not filed until November 30, 1984, and the petition to revoke the surrender was not filed until December 20, 1984.

It was further Miss Pulley's testimony that one of the reasons she had decided to give the child up for adoption was that she did not feel that her family would be supportive of her. She testified, however, that she learned while she was still in the hospital following the birth of the child that the family was very supportive and would help her in caring for her child.

Miss Pulley stated that after she returned home she experienced mixed emotions, that she missed her child a great deal but was uncertain what to do. She was under the impression even before the surrender that it would not be possible to get the child back and, at the time of the sur-

render, she was confused and experiencing great pressure and stress.

By her first issue, Miss Pulley insists that "[t]he surrender of [her] son for adoption came as a result of imposition of undue influence, the Trial Court therefore erred in denying [her] petition for revocation of surrender."

Undue influence has been defined as that influence which controls the mental operations of the one influenced by overcoming his power of resistence and thus obliging him to adopt the will of another, thereby producing a disposition of property or the performance of some act by the influenced person which he otherwise would not have done.

50 A.L.R.3rd 918, 920 (1973).

In considering whether parental consents to adoption or to the surrender of their children to child placement or similar agencies were obtained through duress, courts have defined and construed the term "duress" according to its generally understood meaning, to signify that condition which exists where one is induced by the unlawful act of another to make a contract or to perform or forego an act under circumstances which deprive him of the exercise of his free will.

74 A.L.R.3rd 527, 530 (1976).

"Moral duress" consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another, and relief is granted in such cases on the basis that the party benefiting thereby has received money, property, or other advantages which in equity and good conscience he should not be permitted to retain, said the court in *Huebert v. Marshall* (1971) 132 Ill App 2d 793, 270 NE2d 464.

*Id.* at 533.

■ The imposition of undue influence is a ground for revocation of the surrender of a child. *State v. A Licensed or Chartered Child-Placing Agency*, 194 Tenn. 400, 250 S.W.2d 776 (1952).

■ At the hearing to revoke the surrender, the burden was on Miss Pulley to show that she was under duress and that the surrender was brought about by undue influence.

Miss Pulley relies on cases from other jurisdictions in support of her insistence that undue influence was applied forcing her to surrender her child.

In *Methodist Mission Home v. NAB*, 451 S.W.2d 539 (Tex.Civ.App.1970), the mother entered a home for unwed mothers. The court found that the staff mambers had caused the natural mother to believe that her own parents' support for her decision to keep her child was an effort to put something over on the natural mother. She was told by the staff of the home that she had no right to keep her child. The court also found that the natural mother was dependent upon the staff of the home for assistance in finding employment and a place to live. The facts in *Methodist Mission Home* are inapposite to the facts here.

*In Re D*___, 408 S.W.2d 361 (Mo.App. 1966), is also inapposite to this case. There the court simply found that the conduct of the mother was inconsistent with the consent to adopt.

■ Here, Miss Pulley's actions prior to the surrender becoming final are consistent with her desire to place the child for adoption.

She testified that she had asked to see the child before the surrender and they told her she could not see it until the surrender had become final. Her counsel, therefore, concludes that she did the only thing she could in order to see the child—"she signed a surrender form."

We are not persuaded by this conclusion. The record shows that Miss Pulley is a person of above average intelligence. At the time of the surrender she was a college sophomore at Tennessee Tech University and she had made good grades both in high school and at Tennessee Tech University.

At the surrender hearing, she could have told Judge Robinson that she did not desire

to surrender her child, that she wanted to keep the child. Instead, she told Judge Robinson that she felt that it was both in her best interest and the child's that the child be surrendered for adoption. She knew before she signed the surrender that her family would be supportive of her and would help her in rearing the child.

While the record shows that CCS agreed to pay the medical costs if the child was surrendered for adoption, there is no showing that Miss Pulley was indigent or that it was necessary that she rely on CCS for financial assistance.

We find nothing in this record to show that Miss Pulley was under duress or that there was any undue influence exerted upon her which forced her to sign the surrender. There are no "force of circumstances" present in this case which could be deemed to have a coercing effect upon Miss Pulley. There is little doubt that there is always "duress of circumstances" present causing a natural parent to consent to surrender and/or place for adoption that parent's child. However, as was said in *Barwin v. Reidy*, 62 N.M. 183, 307 P.2d 175 (1957), "What natural parent would ever consent to the adoption of his or her child in the absence of duress of circumstances."

This issue is without merit.

Miss Pulley's second issue is whether "[t]he failure to comply with the statutes of Tennessee governing surrender of children for adoption renders the purported surrender of the minor child void."

■ The adoption statutes are in derogation of the common law and must be strictly complied with. *In re Van Huss*, 207 Tenn. 168, 338 S.W.2d 588 (1960). It is Miss Pulley's contention that Tenn.Code Ann. § 36-1-114 was not complied with in that the prescribed form was not used.

■ The surrender form set forth in Tenn.Code Ann. § 36-1-114 applies only when the "surrender of [the] child [is] by the natural parent(s) directly to the prospective adoptive parents."

Here, the child was surrendered by a natural parent to a licensed child-placing agency.

The legislature in its wisdom did not see fit to prescribe the form to be used under circumstances such as we have here. The CCS prepared a surrender form which fully complies with the requirements of Tenn. Code Ann. § 36-1-114. There is no merit to this issue.

Miss Pulley next contends that the "surrender of her son is rendered void by the denial to her of her rights to equal protection of the laws and the assistance of counsel."

■ Tenn.Code Ann. § 36-1-117 provides in pertinent part that the natural parent

shall have the absolute right to revoke the surrender within thirty (30) days from the date of the execution of the surrender or within ninety (90) days from the date of the execution of the surrender if the surrender was executed to a person other than a licensed child-placing agency or the state department of human services....

Miss Pulley contends that this statutory provision discriminates between the class of parents who surrender children to child-placing agencies and those who surrender directly to the prospective adoptive parents since the former are permitted a revocation period of thirty days while the latter are permitted ninety days within which to revoke the surrender. It is her insistence that this classification violates the equal protection clause of the Fourteenth Amendment of the United States Constitution.

Miss Pulley's mother contacted an attorney in Birmingham, Alabama, who advised her to have Miss Pulley do something about revoking the surrender "as quick as possible." This advice was given not later than March, 1984. Further, Miss Pulley was advised by the Court at the time of the execution of the surrender that she had thirty days within which to revoke the surrender. She testified that she fully understood what the court had told her.

We deem it unnecessary to address the constitutionality of this statute. Miss Pulley lacks standing to challenge the constitutionality of Tenn.Code Ann. § 36–1–117. She signed the surrender documents on January 13, 1984. Even if the ninety-day provision was applicable to Miss Pulley, the record shows that she did nothing to revoke the surrender until December 20, 1984, almost eleven months after the execution of the surrender form.

There is no showing that Miss Pulley has been adversely affected by Tenn. Code Ann. § 36–1–117. Under the circumstances, we find no merit to this issue.

Miss Pulley's fourth issue is that "[t]he Trial Court erred in denying appellant's petition to intervene in adoption proceedings pursuant to Rule 24 of the Tennessee Rules of Civil Procedure."

■ Tennessee Rule of Civil Procedure 24.01 provides as follows:

> Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties; or (3) by stipulation of all the parties.

A reading of the motion to intervene and the petition to revoke the surrender shows that they are based upon the same allegations, *i.e.,* that the surrender should be revoked because of "undue influence." Miss Pulley was afforded a full evidentiary hearing on her petition to revoke the surrender. There is nothing she could have shown under her motion to intervene that she did not show in the petition to revoke the surrender.

If the Trial Court erred in disallowing the motion to intervene, it was harmless error, and "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn.R. App.P. 36(b).

This issue is without merit.

By issue five, Miss Pulley contends that "[t]he Trial Court erred in denying appellant the opportunity to give rehabilitating testimony."

The record shows that during cross-examination Miss Pulley was questioned regarding actions taken by the appellees to coerce her into executing a surrender or to place her under duress. She testified that such acts did not occur. On redirect examination, Miss Pulley's counsel asked her questions regarding her understanding of the questions asked her. Miss Pulley answered: "I mean just about somebody forced me to do it."

THE COURT: The proof shows nobody coerced this lady into doing anything, Miss Kirk, and this is not really proper redirect. You are trying to get her to testify again as to what she has already testified to.

MS. KIRK: Your Honor please, I apologize if I appear to be just tedious. I was simply trying to rehabilitate Miss Pulley's testimony following the impeachment by the attorneys.

THE COURT: She has been very honest with the Court. She told me exactly what they did and she has told us two or three times in this testimony she wasn't coerced by anyone. She thought it was best at that time. She has had a change of heart now and she knew that she had thirty days to change her mind from the time she signed the surrender and she is a very bright educated young woman.

MS. KIRK: For the purpose of the record I am hesitant not to ask her at least another question or two. I don't want to annoy the Court but there are a couple of areas for the record I would like to address.

Miss Pulley's counsel then asked her other questions regarding "duress."

A full reading of this record does not support Miss Pulley's contention that the Trial Court did not permit counsel to rehabilitate her testimony. This issue is without merit.

Miss Pulley's sixth issue is that "[t]he Trial Court erred in granting the appellees' motion for directed verdict at the close of the proof presented by Ms. Pulley."

■ This was a non-jury trial. In non-jury trials, a proper motion is a motion to dismiss pursuant to Tenn.R.Civ.P. 41.02(2).

Motions to dismiss at non-jury cases are not to be confused with a motion for directed verdict which is authorized by Tenn.R. Civ.P. 50.

Motions for a directed verdict are neither necessary nor proper in a case which is being tried without a jury. Motions for dismissal in non-jury cases under Rule 41.02(2), Tennessee Rules of Civil Procedure, and motions for directed verdicts in jury cases under Rule 50, Tennessee Rules of Civil Procedure, are somewhat similar, but, there is a fundamental difference between the two motions, in that, in the jury case, the judge is not the trier of facts while in the non-jury case he is the trier of the facts. In the jury case he must consider the evidence most favorably for the plaintiff, allow all reasonable inferences in plaintiff's favor and disregard all counteracting evidence, and, so considered, if there is any material evidence to support a verdict for plaintiff, he must deny the motion. But in the non-jury case, when a motion to dismiss is made at the close of plaintiff's case under Rule 41.02(2), the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and if the plaintiff's case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits, or, the trial judge, in his discretion, may decline to render judgment until the close of all the evidence. The action should be dismissed if on the facts found and the applicable law the plaintiff has shown no right to relief. *City of Columbia v. C.F.W. Construction Co.*, 557 S.W.2d 734, 740 (Tenn.1977).

While counsel for the appellees may have denominated their motion as a motion for a directed verdict, it was treated as a Rule 41.02(2) motion by the Trial Court. The Trial Court correctly determined that Miss Pulley had failed to carry her burden of proving that the surrender she executed on January 13, 1984, should be revoked. The record shows that there was no act on the part of any one of the appellees which would amount to undue influence.

The record shows that Miss Pulley made a conscious decision to voluntarily place her child for adoption without being unduly influenced by anyone. It was not until sometime later that she decided that she wanted to revoke the surrender.

This issue is without merit.

Miss Pulley's seventh, and last, issue is that "[t]he Trial Court erred in denying appellant's request for permission to pursue an interlocutory appeal."

Tennessee Rule of Appellate Procedure 9 provides for an interlocutory appeal by permission from the trial court. If the trial court denies a request for permission to appeal pursuant to Rule 9, then Rule 10, Tenn.R.App.P., provides for an extraordinary appeal by permission on original application in this Court. No application was made pursuant to Rule 10.

■ We are of the opinion that appellant, absent highly unusual circumstances, cannot predicate error upon the trial court's denial of her request for permission to appeal pursuant to Rule 9 without taking the next step and applying for an extraordinary appeal pursuant to Rule 10.

In any event the record here fails to disclose that the Trial Court erred in denying the Rule 9 motion. Miss Pulley failed to show that she was entitled to relief pursuant to Rule 9.

This issue is without merit.

It therefore results that the judgment of the Trial Court is affirmed with costs assessed against the appellant Miss Pulley and the cause remanded to the Trial Court for the collection of costs and any further necessary proceedings.

CANTRELL, J., concurs.

KOCH, J., concurs in separate concurring opinion.

KOCH, Judge, concurring.

I concur in the majority's opinion in this case in all respects. I do so because of the surrender hearing conducted by the trial judge on January 13, 1984. The record concerning this proceeding convinces me, as it did the majority, that the appellant was fully informed of her rights and the consequences of her decision and thereafter did not take timely steps to rescind her decision to surrender her child for adoption. However, the conduct of the Christian Counseling Services should not go without comment. Had it not been for the intervening action of the trial court, I would not hesitate to find that this agency's conduct was improper and that it fatally tainted the validity of the surrender process in this case.

As in many cases of this type, we are dealing here with a young woman at one of the most emotionally vulnerable periods in her life. The appellant in this case was an unmarried teenager from a strict, religious family who feared ostracism if her pregnancy were discovered. Thus, she decided to carry her child in secret and to give the child up for adoption immediately after its birth. To carry out this plan, she was referred to the Christian Counseling Services approximately one week prior to her child's birth. She was told that the agency would pay for all of her medical expenses if she would agree to surrender her child. She accepted this offer because she had no means to support herself. The appellant agreed since she had no means to support herself other than her parents. Thus, with-

in hours after the birth of her son on December 13, 1983, a representative of the agency visited the appellant in the hospital and obtained her signature on papers placing the infant with the agency for the purpose of observation at an agency facility. One of the forms indicated that this was not a final surrender of the child and specifically stated, in part:

> It is also my understanding that any time prior to signing a relinquishment, I may request and be granted my child's release to me.

This document also informed the appellant that she would be required to reimburse the agency for her medical expenses should she ultimately decide not to go through with the surrender of her child.

Soon thereafter, having reconciled with her parents, the appellant requested that she be permitted to see her child for the first time. The agency refused to permit her to do so but promised her that she could see her son after she had executed the formal surrender documents and after the period of time within which she could rescind the surrender had elapsed. The appellant made other requests to see her child and each time was met with the same response.

The reasons for the Christian Counseling Services refusal to permit the appellant to see her child are evident even if unstated. The agency, being primaily interested in placing the child in an "Evangelical protestant home," did not desire to run the risk of the appellant's changing her mind and deciding to keep her child after having the chance to hold it in her arms for the first time. Thus, I can only conclude that the agency was placing its own interests ahead of those not only of the mother but also of the child.[1]

While the best interests of the child is of paramount importance in proceedings such as this one, we should never lose sight of the fact that the natural parents also have certain fundamental constitutional rights that must be observed and honored. *San-*

[1] There is no evidence in this record to show that the appellant would be an unfit parent or that she had done anything that would require terminating her parental rights involuntarily.

*tosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *Lassiter v. Department of Social Services of Durham County, North Carolina,* 452 U.S. 18, 38, 101 S.Ct. 2153, 2165, 68 L.Ed.2d 640 (1981) (Blackmun, J., dissenting); *Bryan v. Bryan,* 620 S.W.2d 85, 87 (Tenn. App.1981); and *In re Riggs,* 612 S.W.2d 461, 469 (Tenn.App.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981). We are all at risk if these rights are forgotten or ignored.[2] The Christian Counseling Services ignored the appellant's rights in this case as well as the terms of its own agreement with the appellant signed on December 13, 1983. She should have been permitted to see her child when she requested to do so.

However, the agency's conduct must ultimately be judged in light of what transpired at the private surrender interview conducted by the trial court on January 13, 1984. At that time, without question, the appellant was informed by the trial judge that she could change her mind and regain custody of her son if she decided to do so within thirty days. The appellant candidly admits that she was told this. There is no evidence in the record that she was incapable or unable to understand the significance of what she was told. Thus, her inaction following the execution of the formal surrender documents must, in the final analysis, be found to be an irrevocable decision to surrender her son.[3]

---

**2.** See *Tennessee Department of Human Services v. Riley,* 689 S.W.2d 164, 172–73 (Tenn.App. 1984) (Nearn, J., dissenting).

**3.** We need not reach the question in this case concerning whether conduct of a child place-

ment agency prior to the formal surrender of a child can be so coercive that it will taint the surrender proceeding notwithstanding the intervention of the trial court.