**Dianna NEAL, Appellant,**

v.

**TEXAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

No. 04–90–00310–CV.

Court of Appeals of Texas, San Antonio.

July 31, 1991.

Rehearing Denied Aug. 29, 1991.

---

Edward P. Cano, Sally L. Justice (ADL), and Jacqueline S. Reibach (ADL), San Antonio, for appellant.

Michael Mery, Asst. Crim. Dist. Atty., San Antonio and Patrick J. Feeney, Asst. Atty. Gen., Tort Litigation Div., Austin, for appellee.

Before BUTTS, CHAPA and CARR, JJ.

CARR, Justice.

This appeal is from a decree terminating the parental rights of appellant, Dianna Neal, to her child, J.N.[1] The trial court's judgment is based solely upon Dianna's affidavit for voluntary relinquishment of parental rights. *See* TEX.FAM.CODE ANN. § 15.02(1)(K) (Vernon Supp.1991) & § 15.03 (Vernon 1986 & Supp.1991).

Trial was before the court without a jury. At each of the proceedings below— the trial, the hearing on the entry of judgment, and the hearing on the motion for new trial—Dianna challenged her execution of the affidavit, contending that it was defective and not voluntary because it was the result of undue influence by her husband, Bernard Robaste.[2] At each of the proceedings, the trial court found that Dianna had executed the affidavit in question voluntarily.[3]

In four points of error challenging both the termination decree (points 1–3) and the

denial of the motion for new trial (point 4), Dianna presents us with a single dispositive issue of whether there was clear and convincing evidence for the trial court to have found that she voluntarily executed the affidavit for relinquishment of parental rights.

■ The Texas Supreme Court has held that the natural right between parents and their children is one of constitutional dimensions. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976). The supreme court has further held that "[t]he termination of this right is complete, final, and irrevocable. It divests forever the parent and child of all legal rights, privileges, duties, and powers between each other except for the child's right to inherit." *In the Interest of G.M.*, 596 S.W.2d 846, 846 (Tex.1980). For these reasons, the proceedings in the case before us must be strictly scrutinized. *See id.*

■ Section 15.02(1)(K) of the Texas Family Code allows the court to grant a petition terminating the parent-child relationship with respect to a petitioner who is not a parent if the court finds that the parent has executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by section 15.03 of the Code. *See* TEX.FAM.CODE ANN. § 15.-02(1)(K) (Vernon Supp.1991). The affidavit referred to in section 15.03 is identified as an "affidavit for voluntary relinquishment of parental rights." TEX.FAM.CODE ANN. § 15.03(a) (Vernon 1986). Because of the very nature of a *voluntary* relinquishment of parental rights, we find that it is implicit in the language of section 15.03 that such an affidavit be executed voluntarily. Accordingly, we hold that only a voluntarily executed section 15.03 affidavit will support a finding under sec-

---

1. In 1986 the Texas Department of Human Services (TDHS) was appointed temporary managing conservator of J.N. and has retained temporary managing conservatorship of J.N. continuously since that time.

2. Bernard Robaste, J.N.'s legal and biological father, having not appealed the decree of termination, is not a party to this appeal.

3. The trial court found three times that Dianna had executed the affidavit voluntarily: (1) when it overruled the objection made by Dianna's counsel at the trial on the merits; (2) when it entered judgment containing a finding under section 15.02(1)(K) of the Family Code; and (3) when it allowed Dianna's motion for new trial to be overruled by operation of law.

tion 15.02(1)(K) of the Family Code. Stated another way, we hold that an involuntarily executed affidavit is a complete defense to a termination suit or decree based solely upon a finding under section 15.02(1)(K) of the Family Code.

■ The question of whether there is sufficient evidence in this case to support the judgment of the trial court must be based on whether that evidence was "clear and convincing." TEX.FAM.CODE ANN. § 11.15(b) (Vernon 1986); *see B.A.L. v. Edna Gladney Home*, 677 S.W.2d 826, 830 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.) ("clear and convincing" standard used to determine whether affidavit of relinquishment of parental rights voluntarily signed). "Clear and convincing" refers to that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX.FAM.CODE ANN. § 11.15(c) (Vernon 1986). We will therefore review the evidence in this case under the clear and convincing standard of proof.

We have before us as part of the record a statement of facts from each of the proceedings before the trial court. Although Dianna was not present at trial, the first proceeding, her counsel objected when the affidavit of relinquishment of parental rights was admitted into evidence. Counsel further informed the court of the following: he was not present when Dianna signed the affidavit; Dianna had a history of mental illness; he had not heard back from Dr. Belvis, a psychiatrist treating Dianna and the child's legal and biological father, Bernard Robaste, to get a determination of whether they had the mental capacity to execute the affidavit in question; and he had a concern about any undue influence that Bernard might have exercised over Dianna.

The record further reflects that the trial judge withheld a ruling on the objection until he heard evidence on the circumstances surrounding the execution of the affidavit.

The Texas Department of Human Services (TDHS) called two witnesses to support its contention that this case was an uncontested, i.e., voluntary, termination proceeding.[4] Tina Jackson, a TDHS caseworker, testified that the affidavit was obtained at Dianna and Bernard's residence six days before trial; that Dianna was very ambivalent about signing the affidavit; that Bernard wanted to sign the affidavit right away; that Dianna did not want to sign; that there was a thirty-minute period during which Bernard kept telling Dianna why he thought they should sign the affidavit; that Dianna was emotional and upset; that Dianna wanted to go to court and talk with her attorney but not without Bernard; and that Bernard did not want to go to court. Jackson further testified as follows:

Q: Do you feel Bernard may have exercised some influence over the decision about whether to sign?

A: Yes, he did.

Q: And to what degree of influence do you think he exercised over her?

A: I think she would have waited until today if he had not.

Q: Waited for today to do what?

A: I am not sure if she would have signed today or not. But I could tell he did exercise enough control over her and pressure to get her to sign that day rather than to wait to today for the reason he didn't want to come to court.

Q: Is there doubt in your mind as to whether this was done voluntarily on Dianna Neal's part?

A: I am not really sure of this relationship. I am not sure of his dominance over her. I really cannot say. He did influence her to sign, yes, he did do that.

Dr. Belvis testified that in his opinion Dianna and Bernard could have had the intelligence and mental capacity to under-

---

**4.** The record reflects that in its petition TDHS pleaded *involuntary* termination of parental rights based on section 15.02(1)(A), (C), (D), and (E) of the Family Code. On the day of trial, however, TDHS filed the affidavit in question, and based on the affidavit, it contended that the proceeding was one for *voluntary* termination of parental rights.

stand the affidavit to terminate their parental rights had they been taking their medication. The record, however, does not reflect whether Dianna was taking her medicine when she signed the affidavit.

At the hearing on the motion for new trial, the trial court again heard evidence on the issue of voluntariness and again found that Dianna had executed the affidavit voluntarily. At the motion for new trial hearing, Dianna testified *without objection.* She testified in part as follows:

Q: Did you sign this affidavit voluntarily?

A: No, I did not.

Q: Did you sign it of your own free will?

A: I signed it but I didn't want to sign it.

\* \* \* \* \* \*

Q: Did you and [Bernard Robaste] ever have any fights *over you wanting to go to court and fight for [J.N.]?*

A: *Yes.*

\* \* \* \* \* \*

Q: Did he influence you in any way in signing the affidavit?

A: He is a little jealous, yes. He told me to sign it.

Q: Has Mr. Robaste ever harmed you physically *because you wanted to go to court and keep [J.N.]?*

A: *Yes.* He doesn't always. Sometimes he realizes what he is doing, sometimes he doesn't.

Q: I am talking about has he caused physical harm to you *because you told him you wanted to keep [J.N.].* Is that right?

A: *Yes.*

Q: Did you feel that at the time you signed the affidavit that Mr. Robaste might cause you physical harm at some point in time if you did not sign the affidavit?

A: Most of the time I live like that. He would not hurt the children but *I know he might hurt me.*

\* \* \* \* \* \*

Q: My question is when she presented the affidavit to you for your signature prior to that time did you have any intention of signing it?

A: I wanted to come to court.

(Emphasis added.) Dianna further testified that she had a history of mental illness.

We now address TDHS's contention that the evidence Dianna presented at the motion for new trial hearing (1) failed to meet the required standard for granting a new trial based on newly discovered evidence; and (2) was not timely presented and thus cannot now be considered on appeal.

■ We dismiss TDHS's first contention because it is clear from the record that Dianna's motion is not based on newly discovered evidence nor does Dianna so contend.[5] The requirements for seeking a new trial based on newly discovered evidence, as enumerated in *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983), are therefore not applicable to the case before us.

■ TDHS's second contention is that Dianna's testimony at the motion for new trial hearing was untimely because it was not presented at the trial on the merits, and therefore, it cannot be considered by us on appeal. TDHS's sole authority to support this contention is the following parts of rule 103 of the Texas Rules of Civil Evidence:

(a) **Effect of Erroneous Ruling.** *Error may not be predicated upon a ruling which admits or excludes evidence* unless a substantial right of the party is affected, and

\* \* \* \* \* \*

(2) Offer of Proof. *In case the ruling is one excluding evidence,* the substance of the evidence was made known to the court by offer.

5. It is undisputed that the evidence appellant presented at the hearing on the motion for new trial was not presented at trial because appellant was unable to appear in court on the date of trial due to lack of promised transportation to court.

**(b) Record of Offer and Ruling.** *The offering party shall,* as soon as practicable, but before the court's charge is read to the jury, *be allowed to make,* in the absence of the jury, *its offer of proof.* The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may, or at request of a party shall, direct the making of an offer in question and answer form.

TEX.R.CIV.EVID. 103(a)(2), (b) (emphasis added).

We reject TDHS's rule 103 argument because the error Dianna alleges in this appeal is not predicated upon an erroneous ruling excluding evidence as contemplated by rule 103(a)(2) nor a denial of an offer of proof within the meaning of rule 103(b). In fact, it is clear from the record that the evidence Dianna presented at the motion for new trial hearing was not "excluded" but was actually received *without objection,* and it is equally clear that the trial court considered this evidence for purposes of deciding the merits of the motion for new trial. Accordingly, we hold that neither rule 103(a)(2) nor 103(b) supports TDHS's argument. TDHS, moreover, does not direct our attention to any other authority.

■ In any case, from our research on the subject we find that *B.A.L. v. Edna Gladney Home,* 677 S.W.2d 826 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.), resolves the issue in favor of Dianna. Both *Edna Gladney Home* and the instant case involve the termination of parental rights based upon affidavits of relinquishment in which one of the parents of the child, the mother in both cases, alleged undue influence in the execution of the affidavit as a defense. Here, as in *Edna Gladney Home,* the mother filed her motion for new trial; the trial court held a hearing on the motion and heard the mother's testimony at the hearing; the motion for new trial was overruled; and on appeal the mother contended that the trial court erred in overruling the motion for new trial. The court held that:

[i]n answering the argument of appellant as to undue influence and overreaching, we must decide *from the evidence in the record of the hearing on the motion for new trial* if there is sufficient evidence to support the judgment of the trial court and its implied findings of fact in support thereof.

*Id.* at 829. Accordingly, in the case before us, we will also examine the record of the hearing on the motion for new trial.

■ We will now address the issue of whether there was sufficient clear and convincing evidence to support the trial court's judgment and findings.

In viewing the evidence to determine whether the court found by clear and convincing evidence that Dianna voluntarily signed the affidavit of relinquishment of parental rights, we first note that this is not a case in which Dianna seeks to "revoke" an affidavit she had previously executed voluntarily. In the case at hand, Dianna is not "changing her mind." *Cf. Brown v. McLennan County Children's Protective Servs.,* 627 S.W.2d 390, 394 (Tex.1982) (appellant's sole reason to set aside termination decree was because she simply changed her mind). The contention in this appeal is that the affidavit has always been defective to the extent that the evidence shows that it was executed involuntarily as a result of undue influence.

The essence of "undue influence" involves overcoming the free will of an individual and substituting the will of another, thereby causing a person to do an act which he would not otherwise have done. *Edna Gladney Home,* 677 S.W.2d at 831. Exerted influence cannot be branded as "undue" merely because it is persuasive and effective. *Methodist Mission Home of Texas v. N.A.B.,* 451 S.W.2d 539, 543 (Tex. Civ.App.—San Antonio 1970, no writ). The law, moreover, does not condemn all persuasion, entreaty, cajolery, importunity, intercession, argument, and solicitation. *Id.*

In this case the only witness to testify at trial as to the issue of undue influence was TDHS caseworker Tina Jackson. She described the degree of influence Bernard exercised over Dianna at the time Dianna

executed the questioned affidavit by testifying that she thought Dianna would have waited until the date of trial had Bernard not exercised such influence over Dianna. Jackson further testified that she was "not sure" whether or not Dianna would have signed the affidavit at the court. Lastly, when asked directly if there was doubt in her mind as to whether Dianna voluntarily executed the affidavit, Jackson testified that she was "not really sure."

At the hearing on the motion for new trial, Dianna testified as to the issue of undue influence. Dianna's testimony reflects the following: Dianna was subjected to past physical abuse and harm from Bernard because she wanted to go to court and keep J.N.; Bernard "told" her to sign the affidavit; Dianna "wanted to come to court"; and at the time Dianna signed the affidavit, she feared that Bernard would physically hurt her at some point in the future if she did not sign the affidavit relinquishing her parental rights to J.N. The fear and threat of physical abuse cannot rightfully be considered a type of persuasion, entreaty, cajolery, or the like. *Cf. id.*

■ When the trier of fact is required to make a finding made by clear and convincing evidence, the court of appeals will sustain an insufficient evidence point of error only if the fact finder could not have reasonably found that the fact was established by clear and convincing evidence. *Williams v. Texas Dep't of Human Servs.,* 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ); *In the Interest of L.R.M.,* 763 S.W.2d 64, 66–67 (Tex.App.—Fort Worth 1989, no writ).

Having reviewed all of the evidence in the record under the clear and convincing standard of proof, we conclude that the record before us does not contain evidence of that effect and quality. From the evidence in the record, we further conclude that the trial court could not have reasonably found by a "firm belief or conviction" that Dianna voluntarily executed the affidavit for relinquishment of parental rights. *See* TEX.FAM.CODE ANN. § 11.15(b), (c)

(Vernon 1986) & § 15.03 (Vernon 1986 & Supp.1991).

Accordingly, we grant Dianna's four points of error. The part of the judgment terminating Dianna's parental rights to J.N. is reversed and that part of the cause is remanded.

CHAPA, J., concurs and files an opinion.

BUTTS, J., dissents and files an opinion.

CHAPA, Justice, concurring.

I concur in the majority opinion.

In this termination of parental rights case, only appellant, Diana Neal, the natural mother of the child, appeals the court's judgment terminating her parental rights.

"The natural right which exists between parents and their children is one of constitutional dimensions", and "grounded on good policy considerations." *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). There exists "the strong presumption that the best interest of a minor is usually served by keeping custody in the natural parents." *Id.* Any action "which permanently sunders those [parent and child] ties", requires "the proceedings [to] be strictly scrutinized." *Id.* Such actions "can never be justified without the most solid and substantial reasons." *State v. Deaton,* 93 Tex. 243, 54 S.W. 901, 903 (1900). Consequently, the Texas Supreme Court has established the requirement that because "[t]ermination is a drastic remedy", "[h]ereafter, the 'clear and convincing evidence' standard of proof will be required in all proceedings for involuntary termination of the parent-child relationship." *In the Interest of G.M.,* 596 S.W.2d 846, 847 (Tex.1980). The clear and convincing standard was defined as " 'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.' " *Id.,* citing *State v. Addington,* 588 S.W.2d 569 (Tex. 1979). In view of the fact that termination of parental rights involves the termination of rights bestowed upon parents by a power far above us all, the standard required can hardly be considered drastic.

According to the pleading, this case was filed as an involuntary termination case. Since appellee's case was based entirely on an affidavit by appellant purporting to be a "voluntary relinquishment of parental rights" under TEX.FAM.CODE ANN. § 15.03(a) (Vernon 1986 & Supp.1991), and as the affidavit was objected to as being involuntary by appellant's counsel, the case continued being an involuntary termination case until the voluntary nature of the affidavit was established. The court correctly withheld ruling on appellant's objection to the affidavit until the court heard evidenced on the issue. Since the case, at this point, continued to be an involuntary termination case, and was entirely dependant on the challenged affidavit by appellant, clear and convincing evidence by the appellee was required to establish that the affidavit was in fact voluntary. However, appellee failed in its burden, and the court erred both in terminating the parental rights of the appellant and in failing to grant a new trial.

In an effort to sustain its burden of establishing that the affidavit was voluntary, appellee merely presented the testimony of Tina Jackson, a caseworker for the appellee, and Dr. Belvis. Jackson testified, among other things, that appellant suffered from mental illness; that although appellant had an attorney representing her in the proceeding, Jackson and a secretary had gone to the home of the appellant and her husband to obtain the affidavits without appellant's attorney being present; that appellant did not want to sign the affidavit at the time of its execution and was very emotionally upset; that appellant did not want to sign the affidavit, but wanted to go to court with her husband; that appellant's husband did not want to go to court and had exercised enough control and pressure over appellant to induce her to sign that day when, in fact, appellant did not want to sign; that Jackson was not sure whether the appellant would have signed the affidavit even on the day of trial had the appellant appeared for trial; and, that Jackson was not sure whether the affidavit was voluntary.

Dr. Belvis, appellant's treating psychiatrist, testified that the appellant could have the intelligence and mental capacity to understand the affidavit if she had been taking her medication at the time. However, the record did not reflect whether the appellant was or was not under the medication at the time the affidavit was signed.

At the hearing on the motion for new trial, only the appellant testified, stating, among other things, that she had a history of mental illness; that she did not sign the affidavit voluntarily; that the affidavit was presented for her signature, at appellant's home and in the absence of her attorney, by Miss Jackson, an employee of the appellee; that at the time the affidavit was presented to her, the appellant had requested that her attorney be present and was told by Miss Jackson that an attorney was not necessary and that there was no sense in her even having a lawyer; that appellant asked Miss Jackson to leave her home, but that Miss Jackson left only after obtaining the signed affidavit; that appellant's husband physically harmed appellant because she wanted to keep the child; that at the time she signed the affidavit, she felt that her husband might cause her further harm if she refused to sign the affidavit; that she did not attend two prior hearing because her husband's mother, Mrs. Goodwin Brown, after promising to take her to court, had, at the last moment, called to tell her she could not take her, leaving her without transportation; and, that Mrs. Brown was the one who was trying to arrange for the adoption of appellant's child, the subject of this proceeding, by Mrs. Brown's other son who resides in California.

Strictly scrutinizing this evidence, as we must, it cannot be said that the evidence reaches the level of a "clear and convincing" standard, or that the evidence establishes "the most solid and substantial reasons" to justify termination of appellant's parental rights. *In Interest of G.M.*, 596 S.W.2d at 847; *State v. Deaton*, 54 S.W. at 903.

I would also reverse and remand.

**224**

BUTTS, Justice, dissenting.

The first point of error is that "there is no factual or legally sufficient clear and convincing evidence that appellant's affidavit of relinquishment was executed voluntarily." The second point of error is that "the great weight and preponderance of clear and convincing evidence shows that appellant executed her affidavit of relinquishment of parental rights as a result of undue influence." The supreme court in *Chambers v. Terrell*, 639 S.W.2d 451, 452 (Tex.1982), expressed its disapproval of the lower court's holding in that case that when the trial is before the court, there must be "clear and convincing evidence" for a "voluntary" termination. This is not a proper ruling, stated the supreme court, because "the trial court, sitting without a jury, did not use a lesser standard." *Id.* Stated differently, in a bench trial termination proceedings, the trial court uses that standard. The same reasoning applies in the present case. This trial court, sitting without a jury, did not use a lesser standard than "clear and convincing evidence." The majority opinion thus inappropriately gives credence to the above noted "no evidence" and "factually insufficient" evidence contentions, as well as a "great weight and preponderance" argument, and holds the clear and convincing evidence standard is not met by the State's proof.

The majority premises its holding on this issue: whether the State presented factually and legally sufficient evidence that Dianna Neal voluntarily executed the affidavit of relinquishment of parental rights. That is not the proper standard because the affidavit of relinquishment of parental rights was *irrevocable*. It is clear that the only and real issue is whether the appellant sustained her burden to show the irrevocable affidavit of relinquishment was obtained as a result of undue influence. Under the facts of this case, that burden rested on appellant.

Section 15.02 of the Texas Family Code allows the court to grant a petition terminating the parent-child relationship when the parent is not the petitioner if the court finds: (1) the parent has ... (K) executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by Section 15.03 of the code. Section 15.03 requires that the court further find that the termination is in the best interest of the child. TEX.FAM.CODE ANN. §§ 15.02, 15.03 (Vernon Supp.1991). Those findings were made by this trial court.

The affidavit of relinquishment in the present case was irrevocable. Appellant does not contest on appeal the finding that termination is in the best interest of the child. Therefore, the appellant had the burden to show *before the judgment of termination was signed* that undue influence caused her to execute the irrevocable affidavit against her will.[1] That was not done.

This irrevocable affidavit of relinquishment is similar to the irrevocable one in *Brown v. McLennan County Children's Protective Services*, 627 S.W.2d 390, 392 (Tex.1982). The affidavit clearly sets out that the mother is relinquishing all parental rights, that she will not be further informed about the suit, and that this act is irrevocable. *Id.* Once a parent has surrendered custody of the child by this particular kind of affidavit of relinquishment, the affidavit may be set aside only by proof of fraud, misrepresentation, overreaching or the like. It was the intent of the Legislature to make such an irrevocable affidavit of relinquishment sufficient evidence on which the trial court can make a finding that termination is in the best interest of the children. *See Brown*, 627 S.W.2d at 394. The irrevocable affidavit of relinquishment and the petition of the Texas Department of Human Services can alone support a trial court's judgment. In the

---

1. **Undue Influence.** For purpose of executing instruments, such [undue influence] exists when there was such dominion and control exercised over the mind of person executing such instruments, under facts and circumstancs then existing, as to overcome his free agency and free will and to substitute the will of another so as to cause him to do what he would not otherwise have done but for such dominion and control. *Board of Regents of University of Texas v. Yarbrough*, 470 S.W.2d 86, 92 (Tex.Civ.App.—Waco 1971, writ ref'd n.r.e.).

present case, however, the mother was served with process and notified of the trial date. She failed to appear several times. Further, she failed to appear for a hearing on entry of judgment.

Unlike *Brown,* there is a statement of facts in this case, a scant 28 pages encompassing three hearings—the trial, the entry of judgment, and the motion for new trial.

Twice the trial court continued the trial on the merits, once on appellant's motion, the second time on the court's motion because appellant failed to appear. When the case was postponed once again, even then appellant failed to appear at the trial. Only her lawyer appeared. However, it was shown that appellant telephoned the lawyer occasionally during this time.

It was appellant's burden at trial to show that the irrevocable affidavit was obtained by fraud, misrepresentation or overreaching or the like. Her attorney stated to the court that the parents (both having mental health problems and histories of treatment) appeared to be coherent when he saw them a week before they signed the affidavits of relinquishment. "Miss Neal contacted me by telephone late Friday afternoon, which was the 13th of October, informing me at that time that she wanted to terminate her parental rights voluntarily to the child." He said he explained her rights to her. He said the two persons felt that even if they succeeded in a jury trial, it was to the best interest of the child [to voluntarily relinquish parental rights] because it was "questionable whether they would be able to provide for the child." He said he talked with appellant on the phone and she indicated she did have the capacity to sign an affidavit of relinquishment and knew what the effect of one was. At the hearing he stated his only concern was any undue influence that the father might have exercised over his client. He stated he had tried to contact his client since the 13th but could not reach her. The trial court heard the case on October 26, 1989.

The only testimony at the trial concerning the affidavit of relinquishment came from the caseworker who obtained the affidavit on October 20th at appellant's residence. She said she explained "I was not making them sign it." They could sign there, or they could come to court and sign. The father wanted to sign immediately. The mother was ambivalent. Two witnesses accompanied the caseworker. She suggested appellant might call her attorney then. She said she asked that they appear in court for this trial. The father did not want to go to court; the mother did. But the mother did not want to come to court without the father. She was emotional and upset.

The appellant's attorney stated that the reason he had the case reset was to give the appellant and father an opportunity to come to court to review the documents "so that I can explain the documents to them." But the appellant failed to appear although given three opportunities to do so. The caseworker, on cross-examination, said appellant read the affidavit first "with the understanding that she was going to sign it but as she read it she was kind of nit-picking through it and bringing out issues." The social worker said she kept offering to call the attorney for appellant if she had any doubts at all and *offered for her to wait until today* (the trial). The mother, she said, wanted to do that, but the father would not come to court. He said "I am not going," and she didn't want to come. Asked, "Do you feel [the father] may have exercised some influence over the decision about whether to sign," the witness answered, "Yes, he did." The witness then speculated, "I am not sure if she would have signed today or not. But I could tell he did exercise enough control over her and pressure to get her to sign that day rather than to wait to today for the reason he didn't want to come to court." The witness continued, "I am not really sure of this relationship. I am not sure of his dominance over her. I really cannot say. He did influence her to sign, yes, he did do that." This is not evidence of "undue influence" as contemplated by the law. It is evidence of the father's adamant refusal to "go to court," and of appellant's signing. This did not prevent her attendance at one of the three hearings subsequent to this time.

It is noteworthy that the mother again failed to come to court when the trial court conducted a hearing on a motion to enter judgment on January 26, 1990. The court commented that entering the judgment had been delayed also. "We have rescheduled this hearing on entry of the decree several times giving or trying to make every effort to bring these people here ..."

The question is whether appellant sustained the burden to prove there was "undue influence" exerted which caused her to sign the affidavit of relinquishment and further to prevent her fro attending one of the court hearings.

The appellant finally appeared at the motion for new trial on February 12, 1990. Of course, the purpose of a hearing on a motion for new trial is not to present evidence which could have been presented at trial and before judgment was returned. The purpose is to demonstrate error *at trial.* Appellant's counsel conceded at oral argument the effect of this rule. Therefore, any new "evidence" going to undue influence to which appellant testified then could have been presented at trial and cannot now be considered. She said the reason she wanted a new trial was because she felt she could take care of the child. She said she had been married (common-law) to the child's father "for five or six years." She said she signed the affidavit of relinquishment, "but I didn't want to sign it." She also said that the caseworker told her "there was no sense in even having a lawyer [present]." Further, she testified she asked the caseworker to leave. She did not recall that her doctor had talked with her shortly after that. She testified that the father and she had "fights" about their son. The father felt the mother should not have the child, but that "the child should go to him."

Q  Did he influence you in any way in signing the affidavit?

A  He is a little jealous, yes. He told me to sign it.

When asked if the father had ever harmed her physically because she wanted to go to court and keep the child, she replied, "He doesn't always. Sometimes he realizes

what he is doing, sometimes he doesn't." One can conclude this is not an answer to the question, nor does it address *undue influence* to sign the affidavit; this is a statement that the father is physically abusive.

Q  Did you feel at the time you signed the affidavit that [the father] might cause you physical harm at some point in time if you did not sign the affidavit?

A  Most of the time I live like that. He would not hurt the children but I know he might hurt me.

Similarly, this is not an answer to the question, rather it repeats the acknowledgment that the father beats her on occasion. The only reason for not appearing in court the previous times, she said, was because of lack of transportation. Again, this was not because of undue influence.

Q  Did you intend to sign the affidavit at the time that [the caseworker] went to you and presented it to you for signing?

A  Human Services has taken good care of J. but I think I can take good care of J.

\*     \*     \*     \*     \*     \*

A  I wanted to come to court.

Appellant never stated that the father unduly influenced her to sign the affidavit. She never stated she was prevented from coming to court by the father or anyone. In fact, her own attorney did not state that he attempted to bring her to court on the second or third trial settings and was prevented from doing so by the father. The late statements by appellant at the hearing on motion for new trial demonstrate only reluctance to come to court and ambivalence about signing the affidavit.

A review of all the record, even including the appellant's own testimony at the motion for new trial, shows that the burden of proving "undue influence" was not sustained.

Therefore, I respectfully dissent.