

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-15-00176-CV

IN THE INTEREST OF A.P., A
CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-99860J-14

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Mother and Father appeal the trial court's order terminating their parental rights to Timmy.[2]  In two issues, Father argues that he involuntarily relinquished his parental rights to Timmy and that the trial court erred by finding that termination of his parental rights to Timmy was in Timmy's best interest.  In two

---

[1]*See* Tex. R. App. P. 47.4.

[2]In an effort to protect the identity and privacy of the minor child involved, we use pseudonyms whenever possible.  *See* Tex. R. App. P. 9.8.

issues, Mother argues that she received ineffective assistance of counsel at trial and that the trial court erred by finding that termination of her parental rights to Timmy was in Timmy's best interest. We will affirm.

## II. BACKGROUND

The Department of Family and Protective Services (Department) sought termination of Mother's and Father's parental rights to Timmy based on allegations that the parents had endangered or allowed Timmy to remain in the care of others who endangered Timmy's physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2015). Mother attended the trial, but Father could not be located as trial began. Citing an inability to contact Father for more than two weeks, Father's attorney requested a continuance, but the trial court denied the request and trial commenced.

According to her testimony at trial, Night Response Investigator Maria Barraza responded to reports made on March 10, 2014, that Father was seen panhandling at a convenience store and asking people for marijuana and ecstasy around his nearby motel room, while Timmy, a year old at the time, could be heard crying and screaming from the motel room. When Barraza arrived at the motel room, she found Father and Timmy inside a disheveled and filthy room. Barraza said that there were "cans of food" lying around and that there was "a small refrigerator that smelled like rotten food." She described "rotten liquid everywhere" as well. The bed in the room "didn't have any sheets," and there were piles of dirty clothes. By Barraza's account, Father was "nervous and

2

agitated." "[Father] was bouncing up and down on the bed" and "just wouldn't be still" while he held Timmy.

Father told Barraza that Mother was not there because she was in jail. Father also told Barraza that Mother was seven months' pregnant. Barraza said that she asked Father whether he had a criminal history, mental health history, or prior interactions with the Department. Father told Barraza that he had previously been diagnosed with schizophrenia but that he refused to take the prescribed medication because it "would make him zone out." Father denied ever having previous dealings with the Department but said that Mother had. Father revealed to Barraza that he had a criminal history that included drug, burglary, and murder charges. The Department introduced evidence that Father had prior convictions for delivery of a controlled substance, aggravated assault with a deadly weapon, and burglary of a habitation.

After initially denying the fact, Father admitted to Barraza that he was addicted to cocaine and told her that he had used cocaine the majority of his life. Father told Barraza that he would use cocaine in his car while Timmy remained in the motel room. Because of this encounter, CPS temporarily placed Timmy with Father's sister (Aunt) and implemented a safety plan which included Father having "no unsupervised contact" with Timmy.

Department Family-based Safety Service Worker Ranarda Squire testified that the Department had previously investigated Mother regarding five of her other children. Squire said that the Department "got involved with the family"

3

because Mother was homeless. After a service plan was in place and Mother had found a place to live, the Department learned that Mother would at times leave a seven-year-old child "to supervise the younger kids." During this time, the Department had concerns regarding Mother's drug use, criminal history, and inability to provide a stable and safe environment for the children. The children were removed from Mother's care multiple times, and the case was ultimately closed with "the kids remaining in [a] parental-child safety placement."

Department Investigator Colleen Raymond testified at trial that she began an official investigation into Mother and Father regarding Timmy shortly after Barraza had set up the initial safety plan. Raymond said that Mother had a history with the Department, including an investigation in 2011 that Mother left her seven-year-old child "in charge of the younger" children. Raymond said that the Department became concerned with Timmy's placement with Aunt after learning that Aunt worked and did not have "appropriate caregivers during the day to help watch" Timmy. Aunt also left Timmy in Father's care after being instructed not to do so. After receiving court authorization to conduct an ex parte removal of Timmy, Timmy was left in the Department's care temporarily. After Raymond's time on the stand, the Department introduced evidence that Mother had a prior conviction for food stamp fraud.

Caseworker Maisha Akbar testified that she was assigned to Timmy's case in March 2014. Akbar said that at that time, she was concerned about Timmy's placement with either parent. Akbar testified that placement of Timmy with

4

Mother was not an option because Mother was incarcerated and had a history with the Department regarding Mother's other children. As to Father, Akbar said that Father's criminal history, drug use, and mental health issues made him an "unstable" person to place Timmy with. Because of these concerns, the Department developed a service plan detailing the criteria for the return of Timmy to Mother's and Father's care. Both service plans included parenting and individual counseling, supervised visitations, the requirement to refrain from criminal activity, and drug testing.

According to Akbar, Mother initially completed much of her service plan, including parenting classes, passing random drug tests, and obtaining housing. Mother also had her baby, Daughter, during the initial phase of her service plan. The Department did not initially seek to remove Daughter, but it did put in a safety plan requiring that Daughter not be with Father "unsupervised."

Father also initially showed promise under his service plan, including being involved in individual and couple's counseling; passing random drug tests; participating in supervised visitations; taking a psychological evaluation; and agreeing to do a drug assessment. After this initial success by both parents, the Department agreed to a "monitored return" of Timmy.

On January 8, 2015, however, Akbar conducted an unannounced visit at the parents' residence, but "[n]obody answered the door." Akbar's text message also went unanswered.

5

The following day, Akbar went back to the residence, made contact with both parents, and administered a drug test. Akbar said that both parents seemed nervous about taking the drug test and that, after initially denying cocaine use, both parents admitted to having ingested cocaine. Drug tests confirmed that both parents had cocaine in their systems. The Department then re-removed Timmy from both parents' care. The Department also successfully removed Daughter from the parents' care. The children were placed in foster care.

According to Akbar, after the children's removal, between January 2015 and May 2015, Mother admitted to using cocaine in each month during that time period; tested positive for drug use three times; and refused drug counseling. Akbar also said that Mother's continued drug use could possibly result in incarceration because Mother was on probation and drug use was a violation of her community supervision terms. Akbar said that Mother did not appear bonded with Timmy.

By Akbar's account, even though Father initially began to go to Narcotics Anonymous after the January removal, Father acknowledged that his drug use continued. Akbar said that Father did admit himself to inpatient rehabilitation for a short period in April 2015 but left. Akbar stated that Father had once shaved his head in order to avoid a scheduled "hair strand" drug test. Akbar said that Father's admission of drug use included a statement that he was "addicted and that he wanted to use." Father also told Akbar that the couple's method for obtaining cocaine was to "just drive to Fort Worth and ask people until they [got]

it." Akbar testified that this behavior constituted an endangerment to both children. She also said that Father had been recently diagnosed with "high anxiety."

Akbar testified that despite their initial efforts to follow their service plans prior to Timmy's re-removal, both parents stopped trying to work their service plans afterwards. Akbar said that she could not verify employment for either parent at the time of trial. Akbar also said that she had been unable to verify adequate housing for either parent since Timmy's re-removal. By Akbar's account, both parents had also missed arranged visitations with Timmy. And Akbar testified that neither parent was able to provide a stable and safe environment for him. Akbar said that the parents' relationship was volatile and that their arguing was "a big concern" for Timmy's safety.

Specifically regarding Timmy, Akbar testified that Timmy "ha[d] a lot of behavioral needs." Akbar described how Timmy threw "a lot of tantrums" and said that he "self-harm[ed] by banging his head against a wall or throwing himself on the floor." She averred that he screamed and hit others, and that he was developmentally behind for his age in that he "[said] very few words, and d[id]n't say them that often." Akbar said that now that Timmy was placed in a foster home, he had qualified for behavioral and speech services and had shown improvement in his behavior. But Akbar said that the Department's attempts to have Timmy evaluated for autism had been thwarted by the parents' failure to attend their portion of the hospital's evaluation. Akbar said rather than

7

acknowledging Timmy's need for an evaluation, "they didn't think that anything was wrong with" him.

Akbar said that although Timmy's current foster home was not a possibility for adoption, the Department wanted to move forward in search of an adoptive home for Timmy, but only after they have interviewed several potential placements and are satisfied that the would-be adoptive family "completely understand[s] the attention that [Timmy] needs." Akbar testified that if Timmy were adopted, he would qualify for lifelong insurance, free college tuition, and other services geared at assisting him with his behavioral development. Akbar averred that termination of both parents' rights to Timmy was in Timmy's best interest.

After these witnesses testified, and after reconvening after lunch, counsel for the Department announced that Father had arrived at court; that both Mother and Father had decided to relinquish their parental rights to Timmy; and that they had both signed irrevocable affidavits signifying their intent in lieu of the Department's proceeding on the endangerment allegations. Thus, Akbar again took the stand to testify regarding the relinquishments.

Akbar testified that both parents had met with their attorneys; that they had both signed relinquishments; that the Department had not offered anything in exchange for the parents' agreeing to sign the relinquishments; and that she believed it was in Timmy's best interest that the court accept the relinquishments. Akbar also said that she saw both parents after they had signed their respective

8

relinquishments and that neither of them had expressed a desire to change their minds regarding their relinquishments. She also averred that neither parent had been forced to sign the relinquishments and that neither parent indicated that they were under any duress when signing. Akbar also said that it appeared to her that both parents had freely and voluntarily signed the relinquishments.

Mother's attorney stated to the court that she had fully explained the relinquishment to Mother; that mother understood what she was signing; and that Mother had signed her relinquishment voluntarily. Father's attorney also stated to the court that after Father arrived at court during lunch, Father voluntarily executed his relinquishment and that Father had stated to his attorney that he felt signing the relinquishment was the best "decision for himself and for his family at this time." Father's attorney averred that she had thoroughly explained the relinquishment to Father and that Father "understood fully what was going on" even though it was "a difficult decision."

The trial court stated that based on the relinquishments, it was granting the petition to terminate both Mother's and Father's parental rights to Timmy. The trial court further found that termination of their parental rights was in Timmy's best interest.

Later, both parents moved for new trials. Mother's motion for new trial was predicated on a claim of ineffective assistance of counsel whereby Mother argued that she had signed her relinquishment affidavit based on erroneous information from her trial counsel. Specifically, Mother argued that her trial

9

counsel did not prepare for trial, coerced her into signing the relinquishment affidavit through threats that she would lose her parental rights to Daughter, and that she did not understand the nature of the relinquishment affidavit. Father argued in his motion that he "was impaired at the time that he executed an affidavit for relinquishment of parental rights." The trial court held a hearing on these motions.

At the hearing, Father testified that he arrived at the lunch break during the termination trial. Father agreed that he had signed his affidavit of relinquishment and even initialed it on every page, but he stated that he did not understand what he was signing. Specifically, Father argued that he was under the influence of cocaine at the time he signed the relinquishment and that he did not fully understand what he had signed until after he was no longer under the influence of cocaine. Father said, "I was just signing. I don't remember nothing on the paper." Father averred that had he not been under the influence of cocaine, he would not have signed the relinquishment.

Father testified that he reads and writes English. Father also averred that he knew that Mother had relinquished her rights to Timmy the day of trial. Father also stated that on the day he signed his relinquishment, he was able to call his sister to arrange a ride to court and able to dress appropriately for court. By Father's account, he signed the relinquishment papers after a thirty-second conversation with his attorney in which the attorney allegedly told him that if he did not sign the papers, then he would lose his parental rights to Timmy,

10

Daughter, and any other children he might have in the future. Father further testified that although he had previously been diagnosed with "bipolar, schizophreni[a]," he did not get confused easily.

Akbar testified at the hearing as well. Akbar said that during the trial lunch break, Father called her and asked for a ride to court. Albar was unable to provide him with transportation. By Akbar's account, Father appeared coherent and able to understand their conversation. After Father arrived, Akbar asked him if he had spoken with his trial counsel. Father acknowledged that he had. Akbar described Father's demeanor as "sad."

According to Akbar, after both parents signed their relinquishments and as they were leaving the courthouse, she had a brief conversation with them and asked when they wanted to arrange a final good-bye visit between the parents and Timmy. Akbar said that Father "was very clear" and "spoke back to [her] clearly." Akbar testified that she did not have any concerns whether Father understood the magnitude of signing his relinquishment and that Father did not appear to her to be under the influence of drugs. Akbar said that Father seemed to understand that the termination trial regarding Timmy was "over"; that both parents appeared to understand that their rights to Timmy had been terminated; and that Father even thanked her for working on Timmy's case and indicated that he planned to work on getting Daughter returned to him and Mother.

As for Mother, Akbar said that as she spoke to both parents after the trial court accepted their relinquishments, Mother never expressed that she had not

11

intended to sign the relinquishment nor did Mother say that she had been pressured to sign it. Akbar averred that she had no concerns that Mother had voluntarily relinquished her rights to Timmy.

Mother testified at the motion-for-new-trial hearing. Mother testified that she had only communicated once with her court-appointed trial attorney prior to the day of trial and said that was via text message. Mother said that during trial, she could not keep track of what was going on because her attorney repeatedly "whispered" to her. Mother said that when she asked her attorney to stop whispering, then her attorney began to write her notes during trial. Mother said the notes were distracting. Mother averred that the written notes were inquiring whether Mother wished to continue trial or "stop and decide to relinquish [her] rights." Mother said that she did not understand what the term "relinquishment" meant but that her attorney had explained that it meant that she would be giving "up [her] rights for [her] son."

Mother said that during trial, her attorney also wrote notes to opposing counsel. Mother said that the Department's counsel initially said "no" to the proposition of allowing her to relinquish her parental rights and forego continuing trial. Mother testified, however, that her attorney informed her at lunch that the Department's attorney had offered to forego continuing trial if Mother would sign a voluntary relinquishment of her parental rights to Timmy. Mother initially testified that she did not choose to voluntarily relinquish her rights at the break and that she believed that trial would continue after lunch. Mother stated, "[A]fter

12

we signed our relinquishment rights, [the parents' attorneys] told us, 'Bye, y'all can leave, the trial is done with.' And I was like, 'What?' And I was just terrified, like 'That's it? We're not going to have no time to go and say our part or how we feel?'" Later, however, Mother averred that she knew she had a choice whether to return to trial but that she felt threatened. She also said that she understood that the "consequences [of signing the affidavit were that she] was going to end up, you know, losing [her] son." Mother averred that she did not tell anyone that day that she did not wish to sign the affidavit. Mother testified that she signed the affidavit of relinquishment, and she agreed that her signature and initials were on the affidavit. She also agreed that multiple witnesses saw her sign the affidavit. Mother further said that after leaving court that day, she discussed with Father how sad it was that they had lost their parental rights to Timmy.

Regarding her signing the affidavit, Mother testified that although her attorney explained the terms of the affidavit to her before she signed it, she did not understand what "irrevocable" meant. By Mother's account, the reason she signed the affidavit was because her attorney had told her that if she did not sign the paperwork, "they were automatically going to take [her] daughter's right[s] and future kids [she] ever had." Mother did testify, however, that her attorney had explained to her that the evidence already presented that morning did "not look[] good" and that it was likely that the trial judge would rule in favor of the Department's petition to terminate her rights to Timmy. Mother said that she understood that if trial had continued, the trial court may have made findings that

13

would have been detrimental to her attempts to retain her parental rights to Daughter in the future. She also testified that she knew that the consequences of signing the affidavit would be that the affidavit would be presented to the trial judge, that her rights to Timmy would be terminated, and that Timmy would be placed for adoption.

Mother's trial attorney, Heather Ogier, testified at the hearing as well. Ogier said that during her preparation for Mother's case, she had difficulty in communicating with Mother because "[s]he was unavailable." Ogier testified that although she had interviewed witnesses regarding Mother's case, she did not file any pretrial motions because she "did not have enough communication with [Mother] in order to know what pretrial motions needed to be filed." Ogier said that she prepared a defense for Mother's case "[a]s much as [she] could." Ogier said that the idea of Mother's relinquishing her rights to Timmy first came up prior to trial. Ogier also said that the reason she was "whispering" to Mother during trial was because she was explaining the trial to Mother and answering her questions.

Ogier agreed that she sent a memo to the Department's attorney regarding relinquishment but said that she had done so "at [Mother's] request." Ogier testified that she was not ill-prepared for trial and that she did not pressure Mother regarding the relinquishment. Ogier said that relinquishment was a topic discussed "thoroughly" the day of trial. Ogier explained that "a lot of time was spent discussing whether or not [Mother] wanted to or should relinquish. There

14

was not any pressure at all put on her." Ogier stated that she did not threaten Mother regarding Daughter. Ogier said that she instead advised Mother, as it pertained to Daughter, regarding the impact of the trial court finding the termination grounds the Department had sought regarding Timmy versus the impact of voluntarily relinquishing her parental rights to him.[3] Ogier agreed that she had advised Mother that relinquishment of her parental rights to Timmy gave Mother a better chance at possibly maintaining her rights to Daughter in the future, and Ogier testified that she thought relinquishment at that time was a good result for Mother considering the damaging testimony that had been presented about Mother during trial. Ogier said that both she and Mother read the entire relinquishment affidavit prior to Mother signing it. Ogier also said that she felt that Mother understood exactly what she was signing.

Lisa Roberts, a notary employed by the Department, testified that she witnessed Ogier explain to Mother the relinquishment affidavit on the day Mother signed it. According to Roberts, in her presence, Ogier explained to Mother what the document was and asked Mother whether she understood it. By Roberts account, Ogier "went over each page and line with [Mother]" as Mother initialed and signed the document. Roberts said that Mother also acknowledged that she understood the affidavit by either nodding her head yes or saying she understood

---

[3]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (West Supp. 2015) (providing that a finding of section (D) or (E) grounds in one case can become a ground of termination in a later case involving another child).

15

it. Roberts said that she did not have any concerns that Mother was voluntarily signing the document. Roberts also said that Mother did not appear to be under any duress nor did she appear to have been threatened into signing the document. Roberts averred that Mother did not hesitate when signing the relinquishment.

Roberts also testified regarding Father. Much like with Mother, Roberts testified that she observed Father's attorney explain the relinquishment affidavit to Father and that she saw Father sign the document. Roberts said that although he "seemed sad," she did not have any concerns that Father did not understand what he was signing. Roberts said, "He seemed to understand" what he was doing and that he appeared to be clear and coherent in his actions of reading and signing the affidavit.

Jessica Hickerson, a student who was interning for the Department on the day of trial, testified at the hearing. Hickerson said that she witnessed both Mother and Father sign their affidavits of relinquishment. She further testified that she signed both affidavits as an official witness.

According to Hickerson, she first observed Mother signing her affidavit. Hickerson stated that she saw Mother initial each page after her attorney had explained the document to her. Hickerson described the demeanor of Mother's attorney as "professional." Hickerson stated that Mother did not appear to be under any coercion and that it appeared that Mother understood what she was doing. Hickerson averred that she did not have any concerns that Mother was

16

unknowingly or involuntarily signing the affidavit. Hickerson also said that Mother never expressed any desire to not sign the affidavit.

Hickerson said that she next witnessed Father sign his affidavit. Hickerson described Father as "calm" and, according to Hickerson, he did not appear to be under the influence of drugs. Much like her testimony concerning Mother, Hickerson said that she witnessed Father's attorney explain the affidavit to Father; she witnessed Father initial each page; and she did not have any concerns that Father did not understand what he was doing. She also stated that Father appeared to voluntarily and knowingly relinquish his rights.

Shayla Dixon, an employee of the Department, testified that she also witnessed Mother and Father sign their affidavits of relinquishment. Dixon said that she signed both affidavits as a witness and that during the signings, she did not have any concerns that either Mother or Father did not understand what they were signing. Dixon testified that she never saw anyone threaten or otherwise tell either Mother or Father that they had to sign the affidavits. According to Dixon, even though Father seemed "more calm" than Mother when signing his affidavit, Dixon had no concerns that Father could not understand what he was signing. Dixon averred, "It appeared he understood completely." Dixon said that at no time did either parent express or otherwise indicate that they had changed their minds and did not wish to sign their affidavits.

After hearing this testimony and arguments by counsel, the trial court denied both Mother's and Father's motions for new trial. This appeal followed.

17

## III. Discussion

### A. Father Has Failed to Demonstrate Duress

In his first issue, Father argues that the trial court abused its discretion by not granting his motion for new trial. Father's argument is predicated on the notion that because he testified that he was under the influence of cocaine at the time he signed his relinquishment affidavit, he was impaired, and that this impairment caused him to sign "the complex legal document" involuntarily and under duress. Father concedes that "[i]t is undisputed that [he] signed an Affidavit of Relinquishment of Parental Rights to the Department." The Department argues, among a myriad of arguments, that Father failed to present evidence of duress. We agree with the Department.

Appellate courts review a trial court's decision denying a motion for new trial for an abuse of discretion. *Dir., State Emps. Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

Proceedings to terminate an individual's parental rights must be strictly scrutinized. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *Neal v. Tex. Dep't of Human Servs.*, 814 S.W.2d 216, 218 (Tex. App.—San Antonio 1991, writ denied). But "[a] direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of

18

waiver of interest in a child is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." *See* Tex. Fam. Code Ann. § 161.211(c) (West 2014); *see also* Tex. Fam. Code Ann. § 161.103 (West Supp. 2015) (describing requirements for an affidavit of voluntary relinquishment of parental rights); *Neal*, 814 S.W.2d at 219 (holding that "an involuntarily executed affidavit is a complete defense to a termination suit or decree based solely upon a finding under section [161.001(1)(K)] of the Family Code").

After the Department has demonstrated that the requirements of section 161.103 have been complied with, the party opposing the affidavit must prove, "by a preponderance of the evidence," that the affidavit "was executed as a result of fraud, duress, or coercion" for the trial court to set aside the affidavit. *See In re D.E.H.*, 301 S.W.3d 825, 830 (Tex. App.—Fort Worth 2009, pet. denied) (en banc); *see also In re A.C.*, No. 12–14–00122–CV, 2014 WL 6803987, at *4 (Tex. App.—Tyler Oct. 22, 2014, no pet.) (mem. op.); *In re C.E.*, No. 02-14-00054-CV, 2014 WL 3866159, at *5 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.). A person shows duress when, because of some kind of threat, he is incapable of exercising his free agency and unable to withhold consent. *D.E.H.*, 301 S.W.3d at 829.

In this case, simply put, Father failed to demonstrate that he was incapable of exercising his free agency and unable to withhold his consent because of "some kind of threat." *Id.* Father's arguments are akin to the arguments found in *In re A.H.*, No. 09-14-00291-CV, 2014 WL 7183973, at *4 (Tex. App.—Beaumont

Dec. 18, 2014, no pet.) (mem. op.). In *A.H.*, a mother argued that she could not have knowingly and voluntarily executed her relinquishment affidavit because she had "blacked out and [did] not remember" executing the document. *Id.* at *5. The mother testified at the motion-for-new-trial hearing that all she remembered was being told to sign "a piece of paper" and that later she was told what she had signed. *Id.* at *6. The Beaumont court reasoned that because there was testimony presented at the motion-for-new-trial hearing that Mother did not appear to have blacked out as she signed the affidavit; that because the testified-to observations were that mother exhibited no abnormal behaviors; and that because mother had been represented by counsel when she signed the affidavit, the trial court did not abuse its discretion by denying the mother's motion for new trial. Importantly, the Beaumont court noted that the mother had not testified that she was "fraudulently induced into signing the affidavit, that she was under duress, or that she was coerced into signing the affidavit. During her testimony, the mother did not describe any circumstances to support any allegation of duress, coercion, or fraud." *Id.* at *7.

Likewise, here, Father testified that he did not understand what he was executing because he had ingested cocaine and that it was not until later, ostensibly because he was no longer under the influence of cocaine, that he realized what he had signed. The Department, however, put on testimony by witnesses to Father's signing of his affidavit that he did not appear to be under the influence of drugs, that his behaviors were normal for someone who was

20

signing such a document, and that he was represented by counsel when he signed his affidavit. Further, Father did not testify to any circumstances supporting an allegation of duress.

We conclude that Father did not prove duress by a preponderance of the evidence and that he therefore did not prove that his affidavit of relinquishment was involuntarily executed. *See In re M.A.W.*, 31 S.W.3d 372, 375–76 (Tex. App.—Corpus Christi 2000, no pet.) ("In the instant case the evidence showed that appellant did not make any claim of duress, overreaching, coercion, or fraud at the time of the relinquishment or at the motion for new trial."). Accordingly, the trial court did not abuse its discretion by denying Father's motion for new trial. We overrule Father's first issue.

### B. Mother Received Effective Assistance of Counsel

In her first issue, Mother argues that the trial court abused its discretion by denying her motion for new trial based on her argument that she received ineffective assistance of counsel at trial. Mother's argument is that her court-appointed trial counsel was ill-prepared for trial and coerced her into signing her relinquishment affidavit in order to avoid putting on a defense.

An indigent parent who is appointed counsel pursuant to Texas Family Code section 107.013(a)(1) has a right to the effective assistance of counsel. Tex. Fam. Code Ann. § 107.013(a)(1) (West Supp. 2015); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). The proper standard for determining claims of ineffective assistance is the two-step analysis adopted by the United States Supreme Court

in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *M.S.*, 115 S.W.3d at 545.

Under the first prong, Mother must show that counsel's performance was deficient. *M.S.*, 115 S.W.3d at 545. We must primarily focus on whether counsel performed in a "reasonably effective" manner. *Id.* Counsel's performance falls below acceptable levels of performance when the representation is so grossly deficient as to render proceedings fundamentally unfair. *Id.* In this process, we must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic. *Id.* It is only when the conduct was so outrageous that no competent attorney would have engaged in it that the challenged conduct will constitute ineffective assistance. *Id.*

Under the second prong, Mother must establish that counsel's defective performance caused harm. *See id.* at 549–50. Harm is established by showing that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See id.* at 550.

Citing Family Code section 107.0131, Mother argues that her counsel's representation fell below acceptable levels of performance because Ogier testified at the motion-for-new-trial hearing that she had sent an email to appellate counsel stating that Mother's case file was "scarce" and that it "appears" from Ogier's testimony that Ogier had not obtained "copies of the

22

documentation of [Mother's] case." Tex. Fam. Code Ann. § 107.0131 (West 2014).

Even assuming that the failure to comply with section 107.0131 constitutes falling below acceptable levels of performance, there is nothing in the record that indicates whether or not Ogier had obtained "copies of the documentation of [Mother's] case." Even though Mother characterizes Ogier's testimony as leaving that impression, no such record testimony or evidence exists. Further, Ogier testified that her email stating that Mother's case file was "scarce" was in error and the trial court was free to believe this testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Moreover, Ogier testified that as part of her trial strategy, she advised Mother of the advantages of signing the relinquishment affidavit versus allowing the trial court to make endangerment findings. Even though Mother testified, and now claims on appeal, that she did not wish to sign the relinquishment affidavit, Mother's own testimony also contradicted this assertion, and Ogier testified that Mother had made the choice to sign the relinquishment affidavit after being advised of the consequences. In essence, Mother asks this court to ignore all testimony contrary to the assertions that she now makes on appeal. But determining the credibility and weight to be given to testimony was the province of the trial court. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The evidence adduced at the motion-for-new-trial hearing evinces that Ogier had a trial strategy and that Mother elected to take Ogier's advice. We conclude that Mother has failed to show that Ogier's representation

fell below acceptable levels of performance, and we cannot conclude that Ogier's representation was so grossly deficient as to render the proceedings below as fundamentally unfair or that Ogier's actions of advising Mother to sign the relinquishment affidavit were so outrageous that no competent attorney would have engaged in it. *See M.S.*, 115 S.W.3d at 545. Having determined that Mother has failed to prove the first prong of the *Strickland* analysis, we need not address the second prong. *Strickland*, 466 U.S. at 677, 104 S. Ct. at 2063. We overrule Mother's first issue.

### C.    Best Interest Finding

In their respective second issues, both Mother and Father argue that the trial court erred by finding that termination of their parental rights was in Timmy's best interest. We disagree.

An affidavit of relinquishment, in and of itself, is sufficient to support the best interest finding. *See Brown v. McLennan Cty. Children's Protective Servs.*, 627 S.W.2d 390, 394 (Tex. 1982) (stating that "it was the intent of the Legislature to make such an affidavit of relinquishment sufficient evidence on which the trial court can make a finding that termination is in the best interest of the children"); *Lumbis v. Tex. Dep't of Protective & Regulatory Servs.*, 65 S.W.3d 844, 850 (Tex. App.—Austin 2002, pet. denied) ("An irrevocable affidavit relinquishing a parent's rights and a petition for termination can support a finding that termination is in the best interest of the child and a judgment of termination."); *Ivy v. Edna Gladney Home*, 783 S.W.2d 829, 833 (Tex. App.—Fort Worth 1990, no writ)

24

(holding that "an affidavit of waiver of interest in child, in and of itself, is sufficient to find termination is in the best interest of the child").

Here, both Mother and Father signed affidavits of relinquishment wherein they agreed that "[t]ermination of the parent-child relationship between" themselves and Timmy was "in the best interest of [Timmy]." These affidavits are sufficient to support the trial court's findings that termination of Mother's and Father's parental rights to Timmy was in his best interest. *See Ivy*, 783 S.W.2d at 833. We overrule both Mother's and Father's second issues.

## IV. CONCLUSION

Having overruled all of Mother's and Father's issues, we affirm the trial court's order.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: LIVINGSTON, C.J.; MEIER and SUDDERTH, JJ.

DELIVERED: November 19, 2015