

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00522-CV

**IN THE INTEREST OF K.L.G., JR.**, M.S.G., Jr., Z.G.K.G., A.E.S.G., Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-02176
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Sandee Bryan Marion, Chief Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Marialyn Barnard, Justice
                Rebeca C. Martinez, Justice

Delivered and Filed: November 25, 2015

AFFIRMED

Conquita Y.T. appeals the trial court's order terminating her parental rights to her four children, K.L.G, Jr., M.S.G., Jr., Z.G.K.G., and A.E.S.G. Conquita raises two issues on appeal asserting: (1) she did not voluntarily execute an affidavit of relinquishment; and (2) the evidence is insufficient to show termination of her parental rights was in the best interest of the children. We affirm the trial court's order.

### PROCEDURAL HISTORY

On September 15, 2014, the Texas Department of Family and Protective Services filed its original petition to remove Conquita's children from her care. On the date the petition was filed,

K.L.G., Jr. was eleven, M.S.G., Jr. was nine, K.G. was six,[1] and twins Z.G.K.G. and A.E.S.G. were one.

The affidavit accompanying the petition stated that the Department had been working with Conquita and Maurice G., the father of four of the children, since allegations of neglectful supervision were received in October of 2013. The Department had been working with Conquita "to address ongoing concerns of instability and [a] history of [Conquita] becoming overwhelmed with her five children, having mental health issues that are not being treated or addressed and ongoing anger management issues." One example of instability described in the affidavit involved an altercation between Conquita and Maurice's girlfriend during which Conquita sustained multiple injuries, including two black eyes, scratches, and bruising. The eldest child, K.L.G., Jr., was present during the altercation and attempted to intervene. The affidavit further stated Conquita "has not cared for all five of her children independently for any length of time through the duration of their lives," noting K.L.G., Jr. and M.S.G., Jr. had been cared for by a "fictive" grandmother for the majority of their lives.[2] Finally, the affidavit detailed the history of Conquita's referrals to the Department which dated back to October of 2002, when Conquita tested positive for marijuana when she gave birth to K.L.G., Jr.

On September 15, 2014, the trial court entered an emergency order to remove the children. On September 25, 2014, the trial court signed a temporary order following an adversary hearing appointing the Department as temporary managing conservator of the children. On October 8, 2014, Conquita reviewed and signed her service plan.

---

[1] Conquita's parental rights to K.G., who has a different father than the other four children, were addressed in a separate order and are not involved in this appeal.

[2] The "fictive" grandmother had raised Conquita after her mother "gave her up when she was 3 months of age," but never officially adopted her.

In February of 2015, the Department filed a progress report with the trial court in preparation for a hearing on March 19, 2015. At that time, K.L.G., Jr. and M.S.G., Jr. were residing with Sarah H., their "fictive" grandmother. A.E.S.G and Z.G.K.G. were placed together in a foster home. Although Conquita was engaged in some of her services, her initial therapist was unable to work with her due to her anger issues. Conquita's new therapist had not worked with her for a sufficient period to make a recommendation; however, the therapist believed Conquita needed to be medicated and possibly needed inpatient treatment to address her mental health issues. Conquita had not made sufficient progress in individual therapy to engage in family therapy. Conquita was referred for outpatient drug treatment after completing her drug assessment but tested positive for marijuana in December of 2014. Although Conquita subsequently re-enrolled in the drug treatment classes, she refused a requested drug test on February 3, 2015. Conquita completed her anger management classes, but she completed only two domestic violence classes and had over eighteen more sessions she needed to complete. Conquita had either quit or been fired from her job and did not have appropriate housing because the person with whom she was living had a CPS history and a criminal background. Conquita had not engaged in parenting classes and had not completed a psychiatric evaluation. Conquita had been late to almost every visit with the children at the Department. Conquita had limited contact with M.S.G., Jr. during the visits because he was not verbal and appeared to be emotionally unattached to his mother.

In June of 2015, the Department filed an updated progress report in preparation for a hearing scheduled for July 9, 2015. K.L.G., Jr. and M.S.G., Jr. were still residing with Sarah H., who wanted to adopt them. A.E.S.G. and Z.G.K.G. had been placed in a different foster home with foster parents who wanted to adopt them. Conquita had been diagnosed as having bipolar disorder, but she had stopped taking her medications and engaging in individual therapy. Conquita admitted to using marijuana on May 26, 2015, and was not engaged in drug treatment because her

counselor discharged her as unsuccessful. Conquita was also discharged from the domestic violence classes in March of 2015 because she still had completed only two of the classes. Conquita was residing with Maurice's brother and could not have children live with her at that location. Conquita still had not engaged in parenting classes or attended an autism awareness class which was recommended based on M.S.G., Jr.'s diagnosis. Conquita continued to be late to nearly every visit with her children at the Department.

The case was called for a final hearing on August 14, 2015. During a recess of the hearing, Conquita executed an affidavit of voluntary relinquishment of parental rights. After the recess, the trial court heard additional evidence and entered a final order terminating Conquita's rights to K.L.G, Jr., M.S.G., Jr., Z.G.K.G., and A.E.S.G.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Family Code, the Department has the burden to prove: (1) one of the predicate grounds in subsection 161.001(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(1), (2) (West 2014); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable burden of proof is the clear and convincing standard. TEX. FAM. CODE ANN. § 161.206(a) (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014).

In reviewing the legal sufficiency of the evidence to support the termination of parental rights, the court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*.

"A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*.

In reviewing the factual sufficiency of the evidence to support the termination of parental rights, a court "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*.

### AFFIDAVIT OF RELINQUISHMENT

In her first issue, Conquita contends the evidence is insufficient to show that she voluntarily executed the affidavit of relinquishment. An unrevoked affidavit of relinquishment is one of the predicate grounds for termination set forth in section 161.001 and is the predicate ground cited in the trial court's order. *See* TEX. FAM. CODE ANN. § 161.001(K) (West 2014).

#### A. Preservation

The State's brief initially asserts Conquita waived this issue by not presenting it to the trial court. The Department, however, "has the burden to prove the elements necessary to support termination of the parent-child relationship." *In re K.M.L.*, 443 S.W.3d 101, 113 (Tex. 2014). When the Department seeks termination based on an affidavit of relinquishment, the Department has the burden to prove the affidavit was voluntarily executed. *Id*. at 113, 115. "An involuntarily executed affidavit is a complete defense to a termination suit based on section 161.001(1)(K)." *Id*. at 113.

#### B. Duress as Ground to Challenge Affidavit

"A direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights . . . is limited to issues relating to fraud, duress, or

coercion in the execution of the affidavit." TEX. FAM. CODE ANN. § 161.211(c) (West 2014); *see also In re D.E.H.*, 301 S.W.3d 825, 828-29 (Tex. App.—Fort Worth 2009, pet. denied). Although Conquita asserts in her brief that she is attacking the voluntariness of her affidavit on the "grounds of duress," Conquita cites a 1991 decision from this court discussing undue influence. *See Neal v. Tex. Dep't of Human Servs.*, 814 S.W.2d 216, 221 (Tex. App.—San Antonio 1991, writ denied). Our decision in *Neal*, however, predated the adoption of section 161.211(c), which limits the grounds of attack to fraud, duress, and coercion. *See* Act of May 26, 1997, 75th Leg., R.S., ch. 601, 1997 Tex. Gen. Laws 2118 (codified at TEX. FAM. CODE § 161.211(c)).

In the context of parental terminations, "duress" has been defined as occurring "when, due to some kind of threat, a person is incapable of exercising her free agency and unable to withhold consent." *In re D.E.H.*, 301 S.W.3d at 829; *see also In re A.T.*, No. 04-15-00121-CV, 2015 WL 4638240, at *3 (Tex. App.—San Antonio Aug. 5, 2015, pet. denied) (same). As evidence of duress, Conquita relies on statements made by the trial judge before a recess was taken for the parties to mediate. Conquita executed the affidavit during the recess.

C.      Evidence Presented

At the beginning of the hearing, Conquita's attorney announced "not ready" and explained she spoke with Conquita's therapist the night before the hearing. Although admitting Conquita had previously not been engaged in therapy because of a car accident and a miscarriage, Conquita's attorney reported Conquita recently "kicked it into gear" and was "substantially engaged" in her service plan. Conquita's attorney further stated, "And, further, I spoke with my client this morning, and she is willing, basically, to mediate this thing, and we may be able to resolve it just having a conversation in the hallway." When the trial judge asked for the response of the ad litem, the ad litem stated,

> Judge, we're not opposed to a mediation. We're not opposed to talking about it in the hallway. We'd be happy to do that, but, bottom line, we need some resolution for the kids.
>
> So, you know, if we could resolve this case through a hallway conversation, great, let's do it; but if we can't, we need to go to trial, Judge, because —

In response, Conquita's attorney stated:

> If we can't though, Judge, if we can't resolve this, based on the information that I just got from my client, I'm asking that she be given more time. I will join in [the motion by the father's attorney] to extend the dismissal date in this case giving my client more time to complete her therapy.
>
> I spoke with the therapist and she said she's on track. And she's going to be able to formulate an opinion within a few months.

The ad litem opposed an extension asserting, "these kids need permanency." The ad litem also informed the trial judge that the oldest child, K.L.G., Jr., was twelve and wanted to speak with the trial judge. The Department's attorney added, "The history is long, Judge." The trial judge acknowledged the history, stating, "Well, mom, I don't know why no one has taken me seriously for a year. Do you think I'm here just to talk? And I said things just because?" The trial judge then briefly summarized the history of the case from its inception in September of 2014, noting Conquita's failure to comply with the service place. Although the case was only at the ten-month mark, the trial judge stated no unusual or extraordinary basis was shown for a reset in view of the case's history. The trial judge then stated he would talk to K.L.G., Jr. while the parties took "time for that hallway conference," and reminded Conquita "this is serious." When Conquita interjected that she had missed some of her counseling sessions because she was in a car accident, the trial judge asked for further information about the car accident, and the case worker explained the car accident occurred in May. The trial judge then stated

> THE COURT: All right. Ya'll talk, guys. I don't know. I don't know.
> I mean, y'all give me input on this. What do y'all think? I don't know. I'm not — I mean, I sympathize with the incident in May, but May is May, and there was September to May. And we have a March hearing, and it wasn't good news in March. And there wasn't good news in July, which is two months after May.

When the father's attorney asked for a mediation in the next week, the trial judge responded, "Mediate what though?" The trial judge then expressed his concern for mediation being successful given the excuses being given for not completing the service plan and told Conquita "You better play ball with us." In response to the request by the father's attorney for an informal mediation, the trial judge stated, "Maybe. Let me talk to [K.L.G, Jr.] and see where we're at." The record then states the trial court took a "short recess."

At the conclusion of the recess, Conquita's attorney announced Conquita had signed a voluntary affidavit of relinquishment, stating:

> Your Honor, I've already filed with the Court mother's affidavit of voluntary relinquishment. It has been reviewed by my client. She read each and every page [and] understood what she was signing.

The trial court took judicial notice of the affidavit. In the affidavit, Conquita designates the Department as managing conservator of the children and states, "I freely, voluntarily, and permanently give and relinquish to the Department all my parental rights and duties." Immediately above Conquita's signature, the affidavit states:

> I fully understand that this Affidavit of Relinquishment of Parental Rights, once signed, is and shall be forever final, permanent, and irrevocable. I fully understand that if I change my mind at any time, I can never force the agency to destroy, revoke, or return this affidavit. I also understand that I will no longer be informed of any hearings or proceedings or decrees affecting the child(ren) named in this Affidavit, including any termination suit.

D.      Conclusion

Having reviewed the trial judge's comments relied upon by Conquita as evidence of duress in the context of the entire record, we hold the comments are not evidence of a threat sufficient to overcome Conquita's ability to exercise her free agency, especially in view of: (1) Conquita's attorney announcing a desire to mediate at the very outset of the hearing; (2) the statements in the affidavit; and (3) the comments by Conquita's attorney that she reviewed the affidavit with

Conquita and that Conquita read every page and understood what she was signing. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's finding that Conquita voluntarily executed the affidavit. Conquita's first issue is overruled.

### BEST INTEREST

In her second issue, Conquita contends the evidence is legally and factually insufficient to support a finding that termination of her parental rights was in the children's best interest. In reviewing the sufficiency of the evidence to support the best interest finding, we apply the factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

K.L.G., Jr. expressed a desire to remain with his fictive grandmother Sarah H., but the twins were too young to express their desires. M.S.G., Jr. is diagnosed as autistic and was unable to express his desires. Conquita was never observed to be engaged with M.S.G., Jr. during visitations and she made no effort to take any classes to learn how to address his special needs. Conquita did not have stable housing or stable employment and demonstrated no ability to handle the children's emotional and physical needs. Conquita was diagnosed as bipolar but refused to take medication and attend therapy; therefore, her mental condition was a danger to her children. The caseworker also expressed concern about Conquita's drug use, and Conquita was unsuccessfully discharged from drug treatment. Although numerous classes and programs were

offered to assist Conquita, she failed to complete her service plan and never attended any parenting classes.

Sarah H. has been a stable presence in the lives of K.L.G, Jr. and M.S.G., Jr. and raised them for most of their lives. Both children are happy in her home, and she took the actions necessary to assist M.S.G., Jr. with his autism. While in Sarah H.'s care, M.S.G., Jr. has attended special education classes and occupational therapy and is learning to communicate with sign language. Although M.S.G., Jr. is emotionally unattached to his mother, he is described as being bonded with Sarah H. and has been observed hugging her and being affectionate with her. The foster parents are also bonded with Z.G.K.G. and A.E.S.G. and have expressed their desire to adopt them. There was testimony the twins were thriving in the foster parent's care. Even Maurice, their father, commented to the Department's legal worker that he had never seen the twins happier than they are with their foster parents.

Having reviewed the entire record, we hold the evidence is sufficient to support the trial court's finding that termination was in the children's best interest.

**CONCLUSION**

The trial court's order is affirmed.

Sandee Bryan Marion, Chief Justice
